STATE of Missouri, Respondent,

v.

Linda GARGUS, Appellant.

No. ED 99233.

Missouri Court of Appeals,
Eastern District,
Northern Division.

Nov. 26, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied Jan.
13, 2014.

Sustained and Cause Ordered
Transferred Feb. 25,
2014.

Case Retransferred May 27, 2014.

Court of Appeals Opinion Readopted
June 2, 2014.

**418**

Craig A. Johnston, Columbia, MO, for appellant.

Chris Koster, Gregory L. Barnes, Jefferson City, MO, for respondent.

GARY M. GAERTNER, JR., Judge.

### Introduction

Linda Gargus (Gargus) appeals the trial court's entry of judgment and sentence upon a jury's verdict finding her guilty of elder abuse in the first degree. On appeal, she argues the trial court erred, first, in entering judgment against her because the State merely proved that she failed to act when she did not have a duty to act; second, in submitting Instruction No. 8 to the jury; and third, in overruling her request for a mistrial because the jury returned inconsistent verdicts. We affirm.

### Background

The State of Missouri charged Gargus with the class C felony of involuntary manslaughter in the first degree and the class A felony of elder abuse in the first degree stemming from the death of her mother, Lorraine Gargus (Victim), while in Gargus' care. The evidence adduced at trial revealed the following, viewed in a light most favorable to the jury verdict.

Victim was an eighty-one-year-old woman suffering from diabetes. After falling in 2005, Victim determined she was unable to walk anymore and became bedbound. Gargus started staying with Victim and Gargus' father in 2008 to help out, and by December of 2009 she had moved in to care for them. In January of 2010, Gargus quit her job at the Clark County Nursing Home, where she had worked since 1973, to care for her parents full time.

Regarding her mother's care, Gargus testified to the following. She cooked for Victim, gave her daily sponge baths, and changed her clothes daily. Victim had been using a bedpan, but in January of 2010, she became incontinent. Gargus tried to give Victim her medicine, but Vic-

tim resisted medication, frequently hiding it or throwing it away.

Tammy Ramsey, an administrator at the Clark County Nursing Home where Gargus had worked, testified that Gargus received her certified nursing assistant (CNA) certification in 1989 and Gargus also had a certificate in insulin administration. All CNAs received continuing training in infection control, treatment of bedsores, skincare, and basic hygiene. Ramsey further testified that the procedure to treat Stage I bedsores was intervention, such as extra padding on beds and repositioning, and that Stage II bedsores require a doctor's treatment and covering to help prevent infection.

Victim had been using fleece and protective coverings on her mattress since 2008 to prevent bedsores. Gargus first noticed a bedsore the size of a tennis ball on Victim's upper buttocks on January 20, 2010. To care for the bedsore, Gargus continued using egg crate and fleece cushioning for Victim's bed, stopped using Depends diapers on Victim to allow the sore to get air, and attempted to turn Victim every hour—however, Victim was reluctant to change positions and Gargus described it as a "constant battle." Victim's husband died on January 31, 2010. At the funeral, family members indicated they wanted to visit Victim, but Gargus discouraged visits. After her husband's death, Victim stopped eating and did not want to drink.

Cindy Hickman (Cindy), Victim's granddaughter, visited Victim on February 2, 2010, and described the mobile home as dirty and smelly. Victim's bed was located in the living room with animal cages stacked around it from floor to ceiling. Cindy testified there were "hundreds" of mice everywhere. Victim was completely covered in a blanket and her eyes were matted shut and she did not recognize Cindy, calling her by her sister Sylvia Winger's name.

Sylvia Winger (Winger), another granddaughter, also visited Victim on February 5. Winger testified that during her visit, Victim was alert and recognized her. Winger did not see anything alarming about Victim's health, but noted that Victim was completely covered in a blanket. Winger stated the home was messy, but she did not see any mice. Gargus testified that the mobile home did have mice.

On February 22, 2010, Gargus called an ambulance after noticing a wound on Victim's foot. She had bathed Victim that morning and put lotion on her feet, but did not see an injury. Victim generally kept her feet uncovered, so any injury would be obvious. Gargus' son alerted her to the injury later that day. Victim was at first resistant to going to the hospital, but Gargus and emergency personnel were quickly able to convince her. The emergency personnel testified that Victim appeared confused and complained of a burning sensation in her rectum. As they moved Victim from her bed to the stretcher, a large mouse or small rat ran out of the bedclothes.

Dr. Neville Crenshaw (Dr. Crenshaw), an osteopathic physician who was Victim's attending doctor, testified that when Victim was admitted to the hospital she was "acutely and critically ill." Victim had several large bedsores in various stages of development. The main bedsore was on Victim's upper buttocks and Dr. Crenshaw descried it as a "huge, gaping, infected wound." The infection had eaten the skin and subcutaneous fat around the bedsore, and an investigator for the Missouri Department of Health and Senior Services (DHSS) testified she could see Victim's tailbone through the basketball-sized wound. The infection tested positive for staphylococcus (staph) and had turned sep-

tic—i.e., had spread to her bloodstream. The surgical floor nurse testified the bedsore smelled like rotting flesh. As well, the emergency room nurse testified Victim had open sores over most of her body and large bedsores on her heels.

Dr. Crenshaw further testified that Victim's second main injury was the trauma to her left foot. Her skin and tissue were removed down to tendon and bone, consistent with having been eaten by a rodent, as witnessed by the emergency personnel. Victim, however, was in no pain from the wound due to the neuropathy, or nerve damage caused by diabetes, in her lower left leg. The following day, an orthopedic surgeon amputated Victim's leg and foot below the knee. He noted the leg was no longer getting any blood supply and was cold and blue. Moreover, he could feel gas under the skin, consistent with gangrene. Last, Dr. Crenshaw testified Victim was malnourished and "profoundly dehydrated."

Victim died on March 11, 2010. Her autopsy revealed that the cause of death was multiple organ failure due to septicemia, stemming from the multiple bedsores and gangrene of the left foot. The medical examiner testified that Victim's death was caused by the bedsore on her back, and that early care of the bedsore could have stopped the disease from progressing. He noted bedsores occur when patients lie on their backs for long periods of time without moving. He further testified the failure to provide a clean environment, movement treatment for the bedsore, and medical care also led to Victim's death.

After Victim was admitted to the hospital, Kris Chamley (Chamley) from DHSS received a hotline report of Victim's condition. She requested that Sheriff Paul Gaudette of Clark County (Sheriff Gaudette) assist her in investigating Victim's injuries. Together, they and several more investigators went to the mobile home shared by Victim, Gargus, and Gargus' son. Gargus consented to a search. The investigators testified that as they approached the mobile home, they could smell rotting flesh from outside. Inside, there were animal cages stacked on a bedframe, the floor, and furniture; investigators counted a total of 40 animals.[1] There was fresh and old animal feces in every room. A large rodent ran across the foot of one investigator. There was moldy food on the kitchen counters and sink. In the bathroom, the toilet had waste in it and the sink and bathtub were covered in cobwebs and filth. Gargus reported the toilet had been broken for several weeks. Gargus informed them the clothes Victim had been wearing were in a washtub in the kitchen, and inspection of the washtub revealed foul-smelling muddy grey water with fleas in it. Gargus testified that she had burned Victim's mattress and bedding once she learned Victim had an infection.

At the close of evidence, Gargus moved for acquittal, which the trial court denied. During the jury instruction conference, Gargus objected to Instruction No. 8 on the grounds that it: (1) assumed Gargus took on the care of Victim; and (2) did not comport with the relevant Missouri Approved Instruction (MAI), in that "the State has added additional elements into this Instruction, where they do not exist." The trial court overruled the objection and submitted Instruction No. 8 to the jury. Following deliberations, the jury returned a verdict of not guilty on Count I, involuntary manslaughter in the first degree, and

---

1. Victim had several animals, including several birds and indoor and outdoor dogs. When Gargus and her son moved in, they brought a cat, more birds, gecko lizards, a ferret, and a chinchilla.

of guilty on Count II, elder abuse in the first degree. At Gargus' request, the trial court polled the jury, and each member of the jury confirmed that they found Gargus guilty of elder abuse in the first degree.

After the trial court released the jury for the evening, the court sent the bailiff into the jury room to retrieve the instructions and unused verdict forms. As the court was putting the forms in order, it noticed Verdict Form F finding Gargus guilty of the lesser-included offense of elder abuse in third degree had also been signed by the foreperson. Gargus moved for a mistrial, citing the inconsistent verdicts. The trial court denied the motion for a mistrial, finding that the polling of the jury had cured any inconsistency between the signed guilty-verdict form presented to the court and the signed guilty-verdict form left in the jury room. The jury reconvened for the penalty phase of the trial and recommended a sentence of 10 years. Gargus moved for a judgment of acquittal JNOV or a new trial,[2] which the trial court denied after arguments. The trial court entered judgment in accordance with the jury's recommendation, sentencing Gargus to a term of 10 years in the Missouri Department of Corrections. This appeal follows.

## Discussion

### Point I

In her first point on appeal, Gargus argues the trial court erred in denying her motion for judgment of acquittal at the close of all the evidence and in entering judgment against her, because the State failed to prove she knowingly caused serious physical injury to Victim. Rather, Gargus argues the State proved, at most, that she failed to act when she had no duty to act. We disagree.

We review challenges to the sufficiency of the evidence supporting a criminal conviction for whether sufficient evidence was presented at trial from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt of all the essential elements of the crime. *State v. Salter,* 250 S.W.3d 705, 710 (Mo. banc 2008); *State v. Gibbs,* 306 S.W.3d 178, 181 (Mo.App. E.D.2010). We accept as true all evidence supporting the jury's verdict, including all favorable inferences therefrom, and disregard all contrary evidence and negative inferences. *Id.*

Gargus asserts two arguments to support her contention that there was insufficient evidence to support her conviction. First, she claims she had no duty to act to protect Victim; and second, she claims the State failed to show she was aware her conduct was certain to cause serious physical injury to Victim.

### 1. *Gargus had a Duty to Act*

■■■ Gargus was charged with elder abuse in the first degree under Section 565.180, RSMo. (2000),[3] which provides: "[a] person commits the crime of elder abuse in the first degree if he attempts to kill, knowingly causes or attempts to cause serious physical injury ... to any person sixty years of age or older...." Criminal liability is premised on conduct involving voluntary acts. Section 562.011.1; *Salter,* 250 S.W.3d at 711. Voluntary acts include "[a]n omission to perform an act of which the actor is physically capable." Section 562.011.2(2). Nevertheless, a "person is

---

2. As relevant on appeal, Gargus argued the trial court erred in overruling her objection that Instruction No. 8 added two elements not supported by the MAI, which had the effect of

punishing Gargus for omissions rather than acts.

3. All statutory references are to RSMo. (2000), unless otherwise indicated.

not guilty of an offense based solely upon an omission to perform an act unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law." Section 562.011.4. Here, Section 565.180 does not expressly provide that the failure to act constitutes first-degree elder abuse, so we must determine if the law "otherwise imposes" a duty to act under the circumstances here. In this case of first impression, we find that it does.

The commentary to Section 562.011 provides some guidance for when the law imposes a duty to act to preserve the life of another. The comment to Subsection 4 notes the difficulty in analyzing criminal liability by omission in crimes that are not defined in terms of a failure to act, but provides an example of liability for manslaughter "based on the failure to perform some act, such as supplying medical assistance to a close relative." Thus, in drafting this legislation, the legislature explicitly considered the circumstances we have here, where Gargus failed to provide medical assistance to her mother. Section 562.011, Comment to 1973 Proposed Code, Subsection 4. Moreover, criminal liability is based on an entire course of conduct, considering acts and omissions together. Section 562.011, Comment to 1973 Proposed Code, para. 1.

Further, the comment to Subsection 4 cites *Jones v. United States*, 308 F.2d 307 (D.C.Cir.1962), for a list of circumstances in which the failure to act may constitute a breach of a legal duty. *Jones* states:

> There are at least four situations in which the failure to act may constitute breach of a legal duty. One can be held criminally liable: first, where a statute imposes a duty to care for another; second, where one stands in a certain status relationship to another; third, where one has assumed a contractual duty to care for another; and fourth, where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid.

*Jones*, 308 F.2d at 310 (citations omitted). While not mandatory authority, the specific reference to *Jones* as a source for Section 562.011.4 increases *Jones'* persuasiveness.

### A. *Gargus Secluded Victim*

We agree with Gargus that only the last of the listed situations, "where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid," could apply herein. However, we disagree with her assertion that because she did not "so seclude" Victim "as to prevent others from rendering aid," she did not have a legal duty to act to prevent Victim's death.

■ Initially, we note there was sufficient evidence in the record from which the jury could have found Gargus did seclude Victim. With no Missouri cases directly on point, we find cases from other jurisdictions instructive. When a defendant volunteers to assist an ailing victim, thus preventing or hindering others from providing assistance, the defendant is considered to have secluded the helpless victim, creating a duty to then provide aid. *See Flippo v. Arkansas*, 258 Ark. 233, 523 S.W.2d 390, 394 (1975) (affirming defendants' conviction for involuntary manslaughter). Likewise, when a person takes a vulnerable victim into his home rather than leaving the victim in a public place where others could take care to prevent harm to the victim, the person can be held criminally liable. *See People v. Oliver*, 210 Cal.App.3d 138, 149, 258 Cal.Rptr. 138, 144 (1989) (affirming defendant's conviction for involuntary manslaughter, finding that when defendant brought extremely intoxi-

cated victim to her home—a private place where she alone could provide care—and allowed him to overdose on heroin that created duty to act).

Here, Gargus voluntarily assumed the care of Victim, moving into her home in December of 2009. The record shows that Gargus had the sole care of Victim and does not show that Victim had frequent visitors after Gargus took over her care. At Victim's husband's funeral, Gargus discouraged family members from visiting Victim. Although Gargus testified Victim was generally uncovered, when both Cindy and Winger visited Victim was completely covered in a blanket, thus covering any existing injuries. A jury could infer from this testimony that Gargus covered Victim when company was present. *See State v. Webster,* 870 S.W.2d 450, 453 (Mo.App. E.D.1994) (this court will not reweigh evidence, but will accept as true evidence and inferences consistent with verdict). Last, while the record repeatedly showed that Victim objected to doctors and hospitals, by not taking Victim to the doctor for routine medical care or calling emergency services—especially considering that Gargus, as a CNA, knew the danger Victim's wounds presented—secluded her from medical help.

B. *Gargus' Duty to Act Arose Solely from her Assumption of Victim's Care*

Regardless of whether or not Gargus secluded Victim, she had a duty to act to prevent injury to Victim. Recent Missouri caselaw suggests a duty to act arises, whether or not the defendant has secluded the victim, when the defendant voluntarily assumes the care of a vulnerable person who is dependent upon the defendant for basic necessities, such as food, clothing, shelter, and medical care. *See State v. Shrout,* 415 S.W.3d 123, 124–25 (Mo.App. S.D.2013). In *Shrout,* the parents of a mentally handicapped adult son were held

criminally liable for his death when they voluntarily assumed his complete care and then did not provide it. While there are differences between the facts in *Shrout* and our case, we find the essence of *Shrout* consistent with the case at bar. In both cases, the defendants voluntarily assumed the care of a person who was unable to care for him or herself, and the victim was wholly dependent on the defendant for food, clothing, and medical care. In both cases, the defendants claimed they owed no duty under Missouri law to care for the person in their sole custody. Here, as in *Shrout,* we do not find that claim persuasive.

■ Moreover, despite the distinction between omissions sufficient for civil negligence liability and omissions sufficient to give rise to criminal liability, Missouri civil precedent is instructive in determining when the duty to act arises. Importantly, "the 'measuring stick' [of duty] is the same in a criminal case as in the law of torts." Perkins & Boyce, Criminal Law, ch. 7, § 2, p. 843 (3d ed.1982). Negligence that is "so gross and wanton as to import malice" can give rise to criminal liability. *State v. Studebaker,* 334 Mo. 471, 66 S.W.2d 877, 881 (1933). Missouri courts have held that the duty to act arises when a defendant voluntarily and gratuitously assumes a responsibility to render services to another, even when there was no duty to act originally; and once a defendant assumes the duty to act, he can be held liable for the negligent performance of that act. *Bowan v. Express Med. Transporters, Inc.,* 135 S.W.3d 452, 458 (Mo.App. E.D.2004); *Martin v. Mo. Highway & Transp. Dep't,* 981 S.W.2d 577, 585 (Mo.App. W.D.1998). This case law in conjunction with *Strout,* convinces us that Missouri law does not require proof of seclusion for the duty to act to attach after a defendant voluntarily

assumes the responsibility to render services to another.

Accordingly, as in *Shrout*, we find that Gargus had a duty to act. Because the record here showed that Gargus voluntarily assumed the care of Victim, knowing Victim was entirely dependent on Gargus for her care, Gargus had a duty to act reasonably in providing that care. This voluntary assumption of duty created criminal liability for the negligent performance of that duty. *See Shrout*, 415 S.W.3d at 124–25. There was sufficient evidence in the record to support criminal liability for Gargus' omissions here.

We are cognizant that elder care by family members presents many difficult challenges. This is a very egregious case, and both prosecutors and trial courts must carefully assess whether the conduct of family caregivers rises to the level necessary for criminal liability under the statute at issue here. Without such extreme facts as Gargus herself being a medical professional, a CNA, combined with Victim's horrific injuries and Gargus' inexcusable delay in seeking medical attention for Victim, the State may not have met its burden of proof for elder abuse in the first degree.

2. *The State Presented Sufficient Evidence to Show Gargus was Aware her Conduct was Certain to Cause Serious Physical Injury to Victim*

■ Gargus next argues that, even if she had a duty to act, there was insufficient evidence to support her conviction, because the State failed to show she was aware her conduct was certain to cause serious physical injury to Victim. Again, Section 565.180 provides that a person commits the crime of elder abuse in the first degree if he knowingly causes serious physical injury to any person sixty years of age or older. Knowledge is defined in Section 562.016.3. A person acts knowingly or with knowledge when he is aware his conduct is practically certain to cause a result. Section 562.016.3. The State may show a defendant's knowledge by direct evidence or by reasonable inferences drawn from the totality of the circumstances of the case. *State v. Davis*, 407 S.W.3d 721, 724–25 (Mo.App. S.D.2013).

Although Gargus argues the evidence did not show she knew that allowing Victim to lie on the bed for long periods of time would cause serious injury, we disagree. The record shows that Gargus had worked in a nursing home since 1973 and had been a CNA since 1989. Her supervisor testified that all CNAs received continuing training in infection control, pressure areas, and skin care. More importantly, Gargus' own testimony revealed that she knew of the importance of preventing and treating bedsores. She testified that since 2008 Victim had had padded bedding to prevent bedsores, and that when she noticed a large bedsore on Victim's upper buttocks, Gargus stopped putting diapers on Victim to allow the bedsore to breathe and attempted unsuccessfully to change Victim's position every hour. Gargus' own testimony established that she knew allowing Victim to lie in the same position on the bed for long periods of time would cause serious injury, i.e. bedsores. *See id.* Despite Gargus' admitted knowledge about the treatment of bedsores and her testimony that she bathed Victim every day and saw Victim's body daily, Gargus let the bedsore progress to Stage IV before calling for medical assistance. When Victim was admitted the hospital, the bedsore was a "huge, gaping, infected wound" through which Victim's tailbone was visible.

Moreover, when Victim was admitted to the hospital, she was malnourished and dehydrated. Gargus testified that Victim stopped eating when her husband died on

January 31, yet Gargus did not call for medical assistance until February 22. Gargus cannot claim she did not know that lack of food and water for three weeks was certain to cause serious physical injury or harm to Victim. Further, despite Gargus' testimony that she bathed Victim daily and rubbed lotion on Victim's feet as late as February 22, she somehow failed to notice that Victim's left leg was not getting any blood supply, was cold and blue, and had gas under the skin consistent with gangrene. The jury was entitled to infer that as a trained CNA, Gargus knew that failing to seek treatment for a diabetic whose leg was in such a necrotic condition was practically certain to cause serious physical injury or harm to Victim. *See id.* Last, as a CNA, Gargus was trained in the importance of hygiene, but isolated Victim in a mobile home infected with mice that had feces on the floor, molding food in the kitchen, and a non-working bathroom. Moreover, Gargus stated to investigators that she washed Victim's clothing in flea-ridden, foul-smelling muddy grey water. As a CNA trained in the importance of hygiene, the jury could infer Gargus knew the condition of the home was certain to cause serious physical injury or harm to Victim, a diabetic with multiple bedsores in various stages of development. *See id.* Indeed, Victim later died of a massive infection.

In light of Victim's horrific and sustained injuries, the jury was entitled to disbelieve Gargus' testimony that she bathed Victim and changed Victim's clothes daily. *State v. Wrice*, 389 S.W.3d 738, 741 (Mo.App. E.D.2013) (jury is free to believe or disbelieve witness' testimony). We will not act as a "super juror," but rather will defer to the findings of the trier of fact. *Id.* The evidence shows that Gargus had a duty to act to prevent injury to Victim and that Gargus knew about but failed to provide the proper treatment of bedsores, failed to ensure Victim ate and drank, and failed—despite her 20 plus years as a CNA—to notice the condition of Victim's leg. Moreover, there was testimony that early care of the bedsores could have stopped the bedsores and resulting infection from progressing. Therefore, we find there was sufficient evidence from which a reasonable trier of fact could conclude Gargus knowingly caused serious physical injury to Victim. *See Salter*, 250 S.W.3d at 710; *Gibbs*, 306 S.W.3d at 181. The trial court did not err in overruling Gargus' motions and in entering judgment.

Point denied.

### Point II

In Gargus' second point on appeal, she argues the trial court erred in submitting jury Instruction No. 8 to the jury, because it included additional paragraphs not authorized by MAI–CR3d. Specifically, she argues the instruction erroneously: (1) presumed—rather than instructing the jury to find—that Gargus assumed the care of Victim; (2) did not require the jury to find she so secluded Victim as to prevent others from rendering aid; and (3) did not require the jury to find an act, required by law, that Gargus had a duty to perform but failed to. We disagree.

The first two arguments in Point II were not preserved for our review, because they were not included in Gargus' motion for new trial. Under Rule 30.20, we may review an unpreserved claim of error only for plain error, which requires that we find a manifest injustice or a miscarriage of justice resulted from the trial court's error. *State v. Nathan*, 404 S.W.3d 253, 269 (Mo. banc 2013).

Here, we find no error, plain or otherwise, in the unpreserved claims. First, contrary to Gargus' assertion, our review of the plain language of Instruction

No. 8 reveals that it did require the jury to find whether Gargus assumed the care of Victim. The instruction stated in relevant part:

> [I]f you find and believe from the evidence beyond a reasonable doubt:
>
> First, that between December 1, 2009, and February 22, 2010, in the County of Clark, State of Missouri, the Defendant, Linda Gargus, by having voluntarily assumed the care of her mother, [Victim], a person unable to meet her physical and medical needs, by moving into [Victim's] house, performing basic caregiving functions such as providing food and water, and representing that she was the primary caregiver for [Victim], and
>
> . . .
>
> Third, that she knowingly caused serious physical injury to [Victim] by leaving her on the bed for long periods of time in unsanitary, rodent infested conditions, causing her to develop gangrenous ulcers and injuries from animal bites,
>
> . . .
>
> then you will find the defendant guilty under Count II of elder abuse in the first degree under this instruction.

Each paragraph lists facts the jury must "find and believe from the evidence." The use of the phrase *by having* in first paragraph does not create a presumption of fact, but rather indicates a list of facts the jury must find.

Second, Gargus argues the instruction was required under *Jones* to include language stating she had "so secluded" Victim "as to prevent others from rendering aid." However, as discussed in Point I, Missouri law does not require the seclusion of a helpless person in order for the duty to act to attach. Thus it was not error for the trial court to submit Instruction No. 8 to the jury without language requiring seclusion.

The third assertion of instructional error in Point II was sufficiently preserved for our review, and we review it *de novo*. *State v. Pennell*, 399 S.W.3d 81, 92 (Mo.App. E.D.2013). If there is an applicable MAI–CR instruction, then under the law the instruction form shall be used to the exclusion of any other instruction. Rule 70.020(b). To reverse a jury verdict for instructional error, the party challenging the instruction must show that the instruction as submitted mislead, misdirected, or confused the jury, and that prejudice resulted from the instruction. *Pennell*, 399 S.W.3d at 92. If a jury instruction does not follow an applicable MAI, we presume such errors prejudice the defendant unless it is clearly established that no prejudice occurred. *Id.*

Instruction No. 8 was based on MAI–CR 319.50, the verdict director for Section 565.180, elder abuse in the first degree. MAI–CR 319.50 reads in full:

> (As to Count ——, if) (If) you find and believe from the evidence beyond a reasonable doubt:
>
> First, that (on) (on or about) [*date* ], in the (City) (County) of State of Missouri, the defendant [*Insert one of the following. Omit brackets and number.*]
>
> [1] attempted to (kill) (or) (cause serious physical injury to) [*name of victim* ] by [*insert means by which attempt was made, such as "shooting," "stabbing," etc.*] him,
>
> [2] knowingly caused serious physical injury to [*name of victim* ] by [*insert means by which attempt was made, such as "shooting," "stabbing," etc.*] him,
>
> and
>
> Second, that at that time [*name of victim* ] was sixty years of age or older, and

Third, that defendant (knew) (or) (was aware) [*name of victim*] was sixty years of age or older,

then you will find the defendant guilty (under Count ——) of elder abuse in the first degree (under this instruction).

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense (under this instruction).

(As used in this instruction, a person attempts to (kill) (or) (cause serious physical injury) when, with the purpose of causing that result, he does any act that is a substantial step towards causing that result. A "substantial step" is conduct that is strongly corroborative of the firmness of the actor's purpose to cause that result.)

(As used in the instruction, the term "serious physical injury" means physical injury that creates substantial risk of death or that causes serious disfigurement of protracted loss or impairment of the function of any part of the body.)

MAI–CR3d 319.50 (2012).

Here, Instruction No. 8 reads in full:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that between December 1, 2009, and February 22, 2010, in the County of Clark, State of Missouri, the Defendant, Linda Gargus, by having voluntarily assumed the care of her mother, [Victim], a person unable to meet her physical and medical needs, by moving into [Victim's] house, performing basic caregiving functions such as providing food and water, and representing that she was the primary caregiver for [Victim], and

Second, that she was physically capable of providing care for her mother, [Victim], and

Third, that she knowingly caused serious physical injury to [Victim] by leaving her on the bed for long periods of time in unsanitary, rodent infested conditions, causing her to develop gangrenous ulcers and injuries from animal bites, and

Fourth, that at the time [Victim] was sixty years of age or older, and

Fifth, that defendant knew [Victim] was sixty years of age or older,

then you will find the defendant guilty under Count II of elder abuse in the first degree under this instruction.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense under this instruction.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement of protracted loss or impairment of the function of any part of the body.

Gargus asserts that Instruction No. 8 did not comply with MAI–CR 319.50, because it did not require the jury to find an act, required by law, that Gargus had a duty to perform but failed to do. The instruction listed "leaving her on the bed for long periods of time in unsanitary, rodent infested conditions" as the means by which Gargus knowingly caused serious physical injury to Victim. Gargus' brief on appeal gives short shrift to this argument, but it appears she asserts that because leaving someone on the bed is an omission, rather than an act, such as shooting or stabbing, the instruction failed to comply with the letter of MAI–CR 319.50. This argument is unavailing. As discussed in Point I, although Section 565.180 does not explicitly assign criminal liability for omissions, we conclude that where the duty to act is otherwise imposed by law, any omis-

sion of that duty constitutes a voluntary act, giving rise to criminal liability under Section 565.180. For this reason, it was not error for Instruction No. 8 to base criminal liability upon an omission, because the omission here constituted a voluntary act. The trial court did not err in submitting Instruction No. 8 to the jury.

Point denied.

### Point III

■ In Gargus' third and final point on appeal, she argues the trial court erred in overruling her request for a mistrial and plainly erred in failing to *sua sponte* refuse to accept the jury's guilty verdict of elder abuse in the first degree, after the jury returned inconsistent verdicts. We disagree.

The trial court has a duty to ensure verdicts are free from defects, inconsistencies, and ambiguities, and the failure to do so may result in reversible error. *State v. McNeal*, 986 S.W.2d 176, 179 (Mo.App. E.D.1999). Inconsistencies can be resolved, however, by polling the jury. *Id.*

Here, the jury, while still deliberating in the jury room, signed two separate verdict forms finding Gargus guilty of both elder abuse in the first degree and the lesser-included offense of elder abuse in the third degree. Nevertheless, the sole verdict form the jury presented to the trial court was for elder abuse in the first degree, and, when polled at Gargus' request, each jury member confirmed they had found Gargus guilty of elder abuse in the *first* degree, specifically. The jury did not

present the verdict form for the lesser included offense of elder abuse in the third degree to the trial court, but left it in the jury room with the remaining instructions and unused verdict forms. Thus, we find the jury did not present inconsistent verdicts to the court.[4] Regardless, following *McNeal*, even if the jury had presented inconsistent verdicts to the court, any inconsistency was cured by polling the jury. *Id.* at 179. In polling the jury, the circuit judge questioned whether each juror had found Gargus guilty of elder abuse in the first degree, and each jury member answered in the affirmative on the record that they had.

We find the trial court did not err in overruling Gargus' motion for a mistrial or in failing *sua sponte* to retroactively reject the jury's verdict. Point denied.

### Conclusion

The judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, J., concurs.

KURT S. ODENWALD, J., concurs.

---

4. Gargus cites several cases for the proposition that inconsistent verdicts should be sent back to the jury for further deliberation. In these cases, however, the verdicts actually presented to the court were inconsistent on their face. In *State v. Zimmerman*, 941 S.W.2d 821 (Mo.App. W.D.1997), the jury handed the bailiff two verdict forms for Count

I. *Id.* at 823–24. In *State v. Peters*, 855 S.W.2d 345 (Mo. banc 1993), the jury initially returned different verdicts of not guilty of assault but guilty of armed criminal action based on assault, which the court noted was inherently inconsistent. *Id.* at 347–48. Such is not the case here.