

# In the Missouri Court of Appeals
# Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101396 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Lincoln County |
| vs. | ) | 12L6-CR00571-01 |
| | ) | |
| JASON C. VOSS, | ) | Honorable Chris Kunza Mennemeyer |
| | ) | |
| Appellant. | ) | Filed: January 12, 2016 |

Jason C. Voss ("Defendant") appeals the judgment and sentence entered after a jury trial

convicting him of first-degree involuntary manslaughter and distribution of a controlled

substance. The trial court sentenced Defendant to seven years of imprisonment and a $5,000 fine

for his involuntary manslaughter conviction and fifteen years of imprisonment for his

distribution of a controlled substance conviction, with the sentences to run consecutively. On

appeal, Defendant argues there is insufficient evidence to support his first-degree involuntary

manslaughter conviction and that the trial court committed reversible error in admitting various

portions of evidence during the penalty phase of trial. We affirm.

### I. BACKGROUND

Defendant was charged with second-degree murder for his involvement in the death of

Douglas Geiger ("Victim"). The information specifically alleged, "[Victim] was killed by heroin

intoxication as a result of the perpetration of the class B felony of distribution of a controlled

substance . . . committed by [D]efendant, in concert with others, on or about April 22, 2012."

Defendant was also charged with the class B felony of distribution of a controlled substance on

the grounds Defendant, in concert with others, allegedly distributed heroin to Victim on the same

date.

## A.    The Guilt Phase

Viewed in the light most favorable to the jury's verdict, the following evidence was

presented during the guilt phase of Defendant's jury trial.

On April 22, 2012, Victim called Defendant's sister Wendy Voss ("Wendy")[1] from a gas

station and asked her to sell him some heroin.  Defendant and his friend Curtis Widener

("Curtis") were at Wendy's house when Victim called.  In part because Wendy had reservations

about selling heroin to Victim, Defendant took heroin capsules from Wendy and agreed to sell

them to Victim.  In addition, Curtis agreed to drive Defendant to Victim's location at the gas

station in exchange for drugs.

Subsequently, Defendant and Curtis picked Victim up from the gas station and drove him

to the America's Best Value Inn ("the hotel") in Troy, Missouri.  On the way to the hotel,

Defendant gave Victim nine capsules of heroin and some syringes, and Victim gave Curtis one

capsule of heroin for driving.  Victim did not pay Defendant for the drugs until later, because

Victim wanted to try out the heroin before he paid for it.  On the way to the hotel, Curtis noticed

Victim was "a little bit edgy" like he had a few beers, and Defendant thought Victim appeared to

be drunk.

When the men got to the hotel, Victim rented a room and invited Defendant and Curtis up

for some beers.  All three men went to Victim's hotel room and once there, Curtis took a can of

---

[1] We will refer to some of the parties involved in this case by their first names for clarity and ease of reading.  No disrespect is intended.

beer and poured it into three plastic cups. Victim then took a knife and began cutting up the beer can to prepare the heroin,[2] but Defendant took the knife and can from Victim, telling him he had been "doing it a lot longer" and "was a lot better at it." Defendant finished cutting the can and folded the edges underneath so Victim would not be cut by the sharp edges of the can.

Victim asked how much heroin he should use, and Defendant said he normally used three or four capsules at a time. Curtis cautioned Victim against using that much heroin, and Victim decided to use two capsules.

Victim started to mix up the heroin, but he was "rough" with the needle, so Defendant took over and drew the heroin into a syringe. Defendant then flicked the needle to get the air bubbles out, and Victim took the syringe and injected the heroin in his arm.

A few minutes after Victim injected the heroin, he said, "Oh yeah, there she is," because Victim was getting a "rush." Defendant then saw Victim's eyes cross. Victim also started to rock back and forth, like he was "nodding off," and Defendant thought Victim was having a negative reaction to the heroin and might pass out. Defendant had never seen someone's eyes cross before and it concerned him. Defendant asked Victim if he was okay, and Victim said he was alright.

Defendant left the hotel room to get ice in case he needed it to bring Victim out of a heroin overdose.[3] While Defendant was gone, Victim was walking and talking to Curtis. When Defendant came back to the room, he set a bucket of ice down and told Victim, "here's some ice." Defendant asked Curtis how Victim was doing, and Curtis told Defendant Victim seemed to be alright. Defendant then asked Victim multiple times whether he was okay, and Victim said he was alright.

---

[2] The bottom of an aluminum can is commonly used for preparing heroin for injection; heroin and water are put in the bottom of a can, heated up, and drawn into a syringe.

[3] Ice can be applied to the head, neck, or groin of a person to bring him out of a heroin overdose.

3

About five minutes after Defendant came back to the hotel room with the ice, Defendant and Curtis left the hotel room. Victim was "really sweating" when Defendant and Curtis began to leave. Victim walked Defendant and Curtis to the door, Victim shook hands with Defendant and Curtis, and Victim hugged Defendant. In addition, at some point before Defendant and Curtis left the hotel, Victim paid Defendant $100 for the drugs.

After Defendant and Curtis left the hotel room, they had two separate conversations about going back to the hotel to check on Victim, once on the way to their truck and once as they were driving home. Defendant and Curtis had the conversations because they were both concerned about how Victim nodded off and his eyes crossed after injecting himself with heroin. Later in the day, Defendant and his sister Wendy also had a conversation about going back to the hotel to check on Victim. However, no one went back to the hotel and checked on Victim, and no one obtained medical help for Victim.

The next morning, a housekeeper knocked on the door of the Victim's hotel room after the checkout time, but no one answered. The housekeeper then entered the room and found Victim lying sideways and face-down in the bed. She also saw drug paraphernalia in the room, and Victim appeared to be dead. Believing Victim had died from a drug overdose, the housekeeper called 911.

Major Raymond Floyd with the Troy Police Department responded to the 911 call and upon arriving at the hotel, he saw Victim lying face down on the bed. The coloring of Victim's body was consistent with Victim having died in a face-down position, and an emergency medical technician and the county coroner subsequently confirmed Victim was dead.

Major Floyd found items in Victim's hotel room which were consistent with drug use, including the bottom of an aluminum beer can with residue and burn marks, two syringes, two

4

empty capsules, and six capsules containing a powder later identified to be heroin.  Major Floyd also found an ice bucket with water in it, three unopened cans of beer, and three plastic cups containing beer.  In addition, there was a note in Victim's hotel room with the name "Wendy" written on it and two phone numbers which belonged to Defendant's sister Wendy.

Officers reviewed surveillance videos from the hotel, which showed Victim arriving at the hotel in a vehicle with two other men who were later identified as Defendant and Curtis. From the videos, officers determined twenty-two to twenty-five minutes elapsed from the time the three men arrived at the hotel to the time Curtis' vehicle left the hotel parking lot.

A few days after Victim was found dead in the hotel room, Defendant was arrested, and Detective Wade O'Heron with the Lincoln County Sheriff's Department questioned Defendant. The interrogation was videotaped, admitted into evidence, played for the jury at trial, and is an exhibit filed with our Court in this appeal.  Detective O'Heron told Defendant his *Miranda*[4] rights prior to questioning, and Defendant indicated he understood those rights.  Detective O'Heron questioned Defendant about his whereabouts and actions on the day Victim died, and Defendant changed his story throughout the course of the interrogation.

Defendant eventually admitted to Detective O'Heron that, (1) he sold nine capsules of heroin to Victim for $100; (2) he gave Victim syringes on the way to the hotel; (3) he took the beer can from Victim in the hotel room and prepared it for heroin; and (4) he got ice for Victim in case he needed it to shock Victim out of a possible drug-induced coma.  Defendant also told Detective O'Heron he saw Victim's eyes cross after Victim injected the heroin, and Defendant stated he had never seen that type of reaction before and he was concerned Victim was having a negative reaction to the heroin.  Defendant also indicated he was aware eye crossing is a symptom of a heroin overdose.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

In addition, Defendant admitted to Detective O'Heron that after he and Curtis left the hotel, Defendant had a total of three separate conversations with Curtis and Wendy about calling someone to help Victim or going back to check on Victim. Defendant told Detective O'Heron the conversations took place because Defendant had never seen a person's eyes cross after taking heroin, and because Victim's reaction to injecting heroin was "not right" and concerning to Defendant. However, despite the conversations, nobody went back to check on Victim.

Toxicology reports revealed Victim had been using heroin prior to his death. Dr. Christopher Long, a forensic toxicologist, testified that if within two to four minutes after injecting heroin a person's eyes crossed and they appeared to fall asleep, this would be indicative of a heroin overdose. Dr. Long also testified that Naloxone, also known as Narcan, is an antidote for a heroin overdose carried by emergency medical technicians, and the sooner one receives an antidote, the better chances for survival. Dr. Long opined Victim died somewhere between thirty minutes and four hours after he was injected with heroin, and Dr. Long concluded Victim died of a heroin overdose.

Dr. Kamal Sabharwal, who performed the autopsy on Victim, also concluded Victim's death was caused by a heroin overdose. Dr. Sabharwal testified that eyes crossing within two to four minutes of injection of heroin, nodding off, and profuse sweating are all symptoms consistent with heroin intoxication.

Defendant filed motions for judgment of acquittal at the close of the State's evidence and at the close of all the evidence, and the trial court denied both motions. Defense counsel and the State agreed on the jury instructions, and the jury was instructed on second-degree murder, the lesser-included offense of first-degree involuntary manslaughter based on Defendant recklessly

causing the death of Victim,[5] and distribution of a controlled substance. The jury found

Defendant guilty of first-degree involuntary manslaughter and distribution of a controlled

substance.

**B.      The Penalty Phase and Subsequent Procedural Posture**

Thereafter, the penalty phase of Defendant's trial took place. The State's evidence

included admissions Defendant made regarding his involvement in heroin overdoses which

resulted in the death of persons other than Victim. Defendant admitted to Chris Duren that he

was involved in her son Brandon's heroin overdose which resulted in his death, and Defendant

admitted to his probation officer, Missy Kruse ("Ms. Kruse"), that he was involved in Bill

Flannery's heroin overdose which resulted in his death. Defendant also admitted to Ms. Kruse

that he was involved in multiple overdoses in the past, and Ms. Kruse stated "[Defendant]

appeared proud that he had been witness to numerous overdoses and that he was able to bring

them back to life." Ms. Kruse also testified, "I asked [Defendant] if he thought [of] himself as

the grim reaper since he had been around so many [drug overdoses], and he lifted his shirt and

showed me his tattoo of the grim reaper."

After the State presented additional evidence and Defendant presented evidence, the

penalty phase concluded. The jury then recommended a sentence of seven years of

imprisonment and a fine to be determined by the court for Defendant's first-degree involuntary

manslaughter conviction and fifteen years of imprisonment for Defendant's distribution of a

controlled substance conviction, which were the maximum sentences which could be imposed

---

[5] *See State v. Lumpkins*, 348 S.W.3d 135, 142-43 (Mo. App. W.D. 2011) (explaining that first-degree involuntary manslaughter based on a defendant recklessly causing the death of a person is a lesser-included offense of second-degree murder).

7

for each crime.[6] Defendant then filed a motion for new trial or, in the alternative, for judgment of acquittal, and the trial court denied the motion.

Subsequently, the trial court entered a judgment in accordance with the jury's sentencing recommendation, sentencing Defendant to seven years of imprisonment and a $5,000 fine for his first-degree involuntary manslaughter conviction and fifteen years of imprisonment for his distribution of a controlled substance conviction, ordering the sentences to run consecutively. This appeal followed.

## II.    DISCUSSION

Defendant raises four points on appeal. In his first, second, and third points on appeal, Defendant asserts the trial court committed reversible error in admitting various portions of evidence during the penalty phase of trial. And in his fourth point on appeal, Defendant argues there is insufficient evidence to support his first-degree involuntary manslaughter conviction.

### A.    Sufficiency of the Evidence

First, we will address Defendant's argument in his fourth point on appeal that there is insufficient evidence to support his first-degree involuntary manslaughter conviction.

#### 1.    Standard of Review

Appellate review of a challenge to the sufficiency of the evidence supporting a criminal conviction is limited to determining whether the State has introduced sufficient evidence from which a reasonable juror could have found defendant guilty beyond a reasonable doubt. *State v. Nash*, 339 S.W.3d 500, 508-09 (Mo. banc 2011). In making that determination, all evidence and inferences favorable to the State are accepted as true, and all contrary evidence and inferences

---

[6] *See* section 565.024.2 RSMo Supp. 2009 (first-degree involuntary manslaughter based on a defendant recklessly causing the death of another person is a class C felony); section 195.211.3 RSMo Supp. 2004 (distribution of heroin is a class B felony); section 558.011.1(2) and (3) RSMo Supp. 2004 (the maximum sentence for a class C felony is seven years and the maximum sentence for a class B felony is fifteen years); section 560.011.1(1) RSMo 2000 (a person convicted of a class C felony may be sentenced to pay a fine).

are disregarded. *Id*. at 509. In addition, great deference is given to the trier of fact, and an appellate court will not weigh the evidence anew. *Id*.

### 2. The Relevance of the Language in the Verdict Director

We initially note that Defendant's sufficiency of the evidence claim is based upon language in the verdict director for first-degree involuntary manslaughter which was submitted to the jury. The verdict director provided in relevant part:

> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about April 22, 2012 . . . [D]efendant caused the death of [Victim] *by not summoning medical help* when [Victim] showed signs of a drug overdose after he injected heroin he purchased from [D]efendant, and
>
> Second, that [D]efendant recklessly caused the death of [Victim],
>
> then you will find [D]efendant guilty under Count I of involuntary manslaughter in the first degree.
>
> . . .
>
> In determining whether [D]efendant recklessly caused the death of [Victim], you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances.

(emphasis added).

Defendant argues there is insufficient evidence to support his conviction because "the [S]tate failed to prove that by not summoning medical help, [Defendant] consciously disregarded a substantial and unjustifiable risk that he would cause [Victim's] death and that [Defendant's] alleged disregard was a gross deviation from what a reasonable person would do in the circumstances." Defendant is essentially claiming that in ascertaining whether there is sufficient evidence to support his first-degree involuntary manslaughter conviction, our Court is limited to

9

the language in the verdict director, i.e., is limited to considering only Defendant's conduct of failing to summon medical help. For the reasons discussed below, we disagree.

As recently explained by our Court in *State v. Myles*, a claim that there is insufficient evidence to support a criminal conviction challenges the trial court's denial of the defendant's motion for judgment of acquittal prior to submission of the case to the jury. 2015 WL 5231606 at *7 (Mo. App. E.D.) (citing *State v. Lane*, 415 S.W.3d 740, 752 (Mo. App. S.D. 2013)). Accordingly, "the question of sufficiency arises before the case is put to the jury and is really an issue of whether the case should have been submitted to the jury." *Myles*, 2015 WL 5231606 at *7 (quoting *State v. Beggs*, 186 S.W.3d 306, 312 (Mo. App. W.D. 2005)). When a defendant challenges the denial of his motion for judgment of acquittal occurring before the trial court instructed the jury, as is the case here, "we evaluate whether the State presented sufficient evidence to submit to the jury the cases against the defendant for the charged crimes *without regard* to the form of the verdict director." *Myles*, 2015 WL 5231606 at *7 (emphasis in original) (quoting *State v. Young*, 369 S.W.3d 52, 54 n.3 (Mo. App. E.D. 2012)). In other words, in determining a sufficiency of the evidence claim, we are not concerned with the language of the verdict-directing instruction submitted to the jury. *Myles*, 2015 WL 5231606 at *7 (citing *Young*, 369 S.W.3d at 54 n.3 and *Lane*, 415 S.W.3d at 752).

Instead, the focus of our review when addressing a challenge to the sufficiency of the evidence is to look at the essential elements of the charged crime and consider each element in turn. *Myles*, 2015 WL 5231606 at *7 (citing *State v. Hines,* 377 S.W.3d 648, 655 (Mo. App. S.D. 2012)). Indeed, as stated by the Missouri Supreme Court, "[a]ppellate review of sufficiency of the evidence is limited to whether the [S]tate has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." *State*

10

*v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015). Therefore, we are concerned only with whether there is sufficient evidence to support the charged crime, based on the elements of the crime as set forth by statute and common law and the evidence adduced at trial. *Myles*, 2015 WL 5231606 at *7.

Based on the foregoing, our Court is not concerned with the language of the verdict director submitted to the jury in ascertaining whether there is sufficient evidence to support Defendant's first-degree involuntary manslaughter conviction, and therefore, we are not limited to only considering Defendant's conduct in failing to summon medical help when Victim showed signs of a drug overdose. Moreover, our Court will determine whether there is sufficient evidence to support Defendant's conviction for first-degree involuntary manslaughter based on the elements of the crime as set forth by statute and common law and the evidence adduced at trial.

### 3. The Elements of First-Degree Involuntary Manslaughter and the Evidence Adduced at Trial

#### a. The Basic Elements

To convict Defendant of first-degree involuntary manslaughter, the State had to prove that he recklessly caused Victim's death. Section 565.024.1(1) RSMo Supp. 2009[7]; *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). A person acts recklessly if "he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Section 562.016.4 RSMo 2000. For purposes of the crime of involuntary manslaughter, a person is considered to act recklessly when "there is a

---

[7] All further references to section 565.024 are to RSMo Supp. 2009, which incorporates legislative amendments through 2008. Section 565.024.1(1) provides a person commits the crime of first-degree involuntary manslaughter if he "[r]ecklessly causes the death of another person."

11

conscious disregard of a risk of death to another and such disregard is a gross deviation from what a reasonable person would do in the circumstances." *State v. Beeler*, 12 S.W.3d 294, 297-99, 299 (Mo. banc 2000).

### b. Conduct and Duty

Criminal liability is premised on a defendant's conduct involving voluntary acts. *State v. Gargus*, 462 S.W.3d 417, 421 (Mo. App. E.D. 2013); section 562.011.1 RSMo 2000.[8] "Voluntary acts include 'an omission to perform an act of which the actor is physically capable.'" *Gargus*, 462 S.W.3d at 421 (quoting section 562.011.2(2)). However, "[a] person is not guilty of an offense *based solely upon an omission to perform an act* unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law." Section 562.011.4 (emphasis added). Missouri's involuntary manslaughter statute is not defined in terms of a defendant's failure to act. *State v. Riggs*, 2 S.W.3d 867, 870 (Mo. App. W.D. 1999); *see* section 565.024. Therefore, in a case where the only evidence to support a defendant's conviction for first-degree involuntary manslaughter consists of the defendant's failure to take certain action, i.e., an omission to perform an act, the defendant can only be found guilty of the offense if a duty to perform the omitted act is otherwise imposed by law. *See id*.; *Gargus*, 462 S.W.3d at 421-22; section 562.011.4. Further, where evidence to support a defendant's conviction for first-degree involuntary manslaughter consists of the defendant's affirmative acts as well as his omissions, the defendant may still be found guilty of the offense even if a duty to perform the omitted act is not otherwise imposed by law. *See id*.

---

[8] All further references to section 562.011 are to RSMo 2000.

### c.    The Circumstances of This Case

This case presents an issue of first impression in Missouri: whether there is sufficient evidence to support a conviction for first-degree involuntary manslaughter which is based on a defendant's involvement in the death of a victim from a drug overdose.

Accepting all evidence and inferences favorable to the State as true, which our standard of review requires us to do, we find there is sufficient evidence from which a reasonable juror could have found Defendant recklessly caused Victim's death.  It is undisputed Victim had been using heroin prior to his death, and Dr. Long and Dr. Sabharwal both concluded Victim died of a heroin overdose.  In addition, Dr. Long testified that Naloxone, also known as Narcan, is an antidote for a heroin overdose carried by emergency medical technicians, and the sooner one receives an antidote, the better chances for survival.  Defendant's involvement in Victim's heroin overdose and subsequent death includes Defendant's affirmative acts as well as his failure to take certain actions.

As for Defendant's affirmative acts, Defendant sold nine capsules of heroin to Victim for $100 and suggested how much heroin he should use (even though the Victim only took half of the dose Defendant had recommended).  Defendant also helped Victim prepare the heroin for ingestion.  Specifically, Defendant crafted the beer can so that heroin could be mixed in water and heated, and Defendant took over mixing up the heroin and drew it into the syringe for Victim.  In sum, Defendant provided the toxin for a price, he provided advice and technical support in its preparation, he helped manufacture the necessary paraphernalia for preparing the drug, and he provided the expertise to load the drug-delivery device.

After Victim injected the heroin, it was clear Victim was getting a "rush" from the drugs, Defendant saw Victim's eyes cross, and Victim also started to rock back and forth, like he was

13

"nodding off." Defendant thought Victim was having a negative reaction to the heroin and might pass out. Defendant had never seen someone's eyes cross before and it concerned him, because Defendant knew eye crossing is a symptom of a heroin overdose. Consequently, Defendant left the hotel room to get ice in case he needed it to shock Victim out of a possible drug-induced coma. Defendant came back to the room, set the bucket of ice down in the corner of the room, and told Victim, "here's some ice." Defendant left the room about five minutes later, after Victim told them he was fine. Victim was "really sweating" when Defendant and Curtis began to leave.

Although there was testimony adduced at trial that Victim may have seemed okay before Defendant left the hotel room, in that Curtis told Defendant Victim seemed to be alright while Defendant was gone getting ice and Victim said he was alright after Defendant asked Victim multiple times whether he was okay, the jury was free to disbelieve this evidence. *See State v. Taylor*, 373 S.W.3d 513, 518 (Mo. App. E.D. 2012) ("[t]he jury may believe all, some, or none of the testimony of any witness"). "The jury also resolves all conflicts in the evidence, and we will not second guess the jury's judgment." *Id*. A reasonable juror could have found Defendant's conversations with Curtis and Wendy after leaving the hotel room indicated Defendant did not believe Victim was "alright." Defendant admitted to Detective O'Heron that after he and Curtis left the hotel, Defendant had a total of three separate conversations with Curtis and Wendy about calling someone to help Victim or going back to the hotel to check on Victim. Defendant told Detective O'Heron the conversations took place because Defendant had never seen a person's eyes cross after taking heroin, and because Victim's reaction to injecting heroin was "not right" and concerning to Defendant.

14

Despite his conversations with Curtis and Wendy, Defendant failed to go back and check on Victim and failed to obtain medical help for Victim. Because the evidence to support Defendant's conviction for first-degree involuntary manslaughter consists of his affirmative acts as well as his omissions, Defendant may still be found guilty of the offense even if a duty to perform the omitted acts is not imposed by law. *See Gargus*, 462 S.W.3d at 421-22; *Riggs*, 2 S.W.3d at 870; section 565.024; *cf.* section 562.011.4 ("[a] person is not guilty of an offense *based solely upon an omission to perform an act* unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law") (emphasis added). Nevertheless, for the reasons discussed below, we find the law imposed a duty upon Defendant to go back and check on Victim and to obtain medical help for Victim under the circumstances of this case.

As previously indicated, Missouri's involuntary manslaughter statute is not defined in terms of a defendant's failure to act, and therefore, any duty to act must be otherwise imposed by the law. *See id.* The commentary to section 562.011, as well as a civil negligence principle applied in another criminal involuntary manslaughter case, is instructive as to when the law imposes a duty to act to preserve the life of another person under the circumstances of this case. *See Gargus*, 462 S.W.3d at 422; section 562.011; *People v. Oliver*, 210 Cal.App.3d 138, 147, 149 (Cal. Ct. App. 1989). While the comment to section 562.011.4 notes the difficulty in determining criminal liability by omission for offenses that are not defined in terms of a failure to act, the comment provides an example of liability for manslaughter "based on the failure to perform some act, *such as* supplying medical assistance to a close relative." *Gargus*, 462 S.W.3d at 422 (quoting section 562.011, Comment to 1973 Proposed Code, Subsection 4) (emphasis added). We find that by using the term "such as," the legislature considered manslaughter can be

15

based on the failure to perform acts *other than* supplying medical assistance to a close relative.

*See id*.; *see also Frank v. Mathews*, 136 S.W.3d 196, 202 (Mo. App. W.D. 2004) (indicating

"such as" is a non-exhaustive statutory term).

Further, pursuant to the comment to section 562.011.4, the failure to act may constitute

breach of a legal duty and one can be held criminally liable for his omissions where, *inter alia*,

"one stands in a certain status relationship to another." *Gargus*, 462 S.W.3d at 422 (quoting

section 562.011, Comment to 1973 Proposed Code, Subsection 4 and *Jones v. U.S.*, 308 F.2d

307, 310 (D.C. Cir. 1962)). A "status" or "special" relationship giving rise to an affirmative duty

to act occurs "where some act or omission on the part of the defendant either created or increased

the risk of injury to [another]." *Oliver*, 210 Cal.App.3d at 147[9]; *see Com. v. Kellam*, 719 A.2d

792, 796 (Pa. Super. Ct. 1998) (using the terms "status relationship" and "special relationship"

interchangeably). Here, that standard has been met. Defendant created and/or increased the risk

of injury to Victim through Defendant's actions of providing Victim with the heroin, suggesting

to Victim how much heroin he should use, helping Victim prepare the heroin for ingestion, and

leaving the hotel room after Victim exhibited signs of an overdose which Defendant recognized

as such. *See Oliver*, 210 Cal.App.3d at 143, 149 (finding that victim's act of injecting himself

with heroin was "an act involving the definite potential for fatal consequences" and defendant

should have known her conduct of allowing the victim to inject drugs in her home contributed to

creating an unreasonable risk of death to the victim when victim collapsed to the floor).

Accordingly, under the circumstances of this case, we find the law imposed a duty on Defendant

to preserve Victim's life, and a reasonable juror could have found Defendant breached that duty

---

[9] *See also State v. Lisa*, 919 A.2d 145, 165 (N.J. Super. Ct. App. Div. 2007) (J. Lihotz, concurring in part and dissenting in part) ("when the failure to act is inconsistent with the common expectation that one would act to prevent an unreasonable risk of harm he created and, but for that omission, the harm would not have resulted, a legal duty to act [i]s triggered").

16

by failing to go back to the hotel and check on Victim and by failing to obtain medical help for Victim. "[C]riminal liability is based on an entire course of conduct, considering acts and omissions together." *Gargus*, 462 S.W.3d at 422 (citing section 562.011, Comment to 1973 Proposed Code, paragraph 1). Therefore, we hold Defendant can be held criminally liable for his omissions as well as his actions.

### 4. Conclusion

There is sufficient evidence from which a reasonable juror could have found Defendant acted recklessly, i.e., consciously disregarded the risk of death to Victim and such disregard was a gross deviation from what a reasonable person would do in the circumstances of this case. Defendant provided the toxin for a price, he provided advice and technical support in its preparation, he helped manufacture the necessary paraphernalia for preparing the drug, and he provided the expertise to load the drug-delivery device. In addition, Defendant failed to go back to the hotel room and failed to obtain medical help for Victim even though Defendant was concerned about Victim's reaction to injecting the heroin after Defendant left the hotel.

There is also sufficient evidence from which a reasonable juror could have found Defendant's recklessness caused Victim's death. The only two medical experts who testified at trial, Dr. Long and Dr. Sabharwal, both concluded Victim died of a heroin overdose. In addition, Dr. Long testified that Naloxone, also known as Narcan, is an antidote for a heroin overdose carried by emergency medical technicians, and the sooner one receives an antidote, the better chances for survival. Such evidence reasonably supports an inference that Defendant's failure to go back and check on Victim and Defendant's failure to obtain medical help for Victim was a cause of his death. *See Oliver*, 210 Cal.App.3d at 150 (similarly finding).

17

Based on the foregoing, there is sufficient evidence to support Defendant's first-degree involuntary manslaughter conviction. Point four is denied.

## B. Penalty-Phase Evidence

Defendant's remaining points on appeal assert the trial court committed reversible error in admitting various portions of evidence during the penalty phase of trial.

### 1. Applicable Standards of Review

When a challenge to the trial court's admission of evidence during the penalty phase is preserved for appeal, we review the trial court's ruling for an abuse of discretion. *See State v. Thurman*, 272 S.W.3d 489, 496-98 (Mo. App. E.D. 2008). An abuse of discretion occurs if the trial court's ruling as to the admission of evidence is "clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Howery*, 427 S.W.3d 236, 250 (Mo. App. E.D. 2014) (quotations omitted). However, even if we find an abuse of discretion, we will not reverse unless we also find that the trial court's error resulted in prejudice to the defendant. *Id*.

On the other hand, when a challenge to the trial court's admission of evidence during the penalty phase is not preserved for appeal, our Court may, in its discretion, review the trial court's ruling for plain error. *See Thurman*, 272 S.W.3d at 496; Rule 30.20.[10] When reviewing a claim for plain error, we will only grant a defendant relief if we find an error occurred and the error affected the defendant's rights so substantially that a manifest injustice or miscarriage of justice resulted. *State v. McKay*, 411 S.W.3d 295, 304 (Mo. App. E.D. 2013); *State v. Brown*, 996 S.W.2d 719, 732 (Mo. App. W.D. 1999). Not all errors rise to the level of "plain error"; plain errors are only those errors which are evident, obvious, and clear. *McKay*, 411 S.W.3d at 304-05. Our Court determines whether plain errors exist based on the circumstances of each case,

---

[10] All further references to Rules are to Missouri Supreme Court Rules (2015).

and plain error can serve as the basis for granting a new trial only if the error was outcome determinative. *Id.*; *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006). A defendant has the burden of demonstrating a manifest injustice or miscarriage of justice resulted from the trial court's alleged error. *McKay*, 411 S.W.3d at 304.

### 2. Whether the Challenged Evidence was Admissible

In this case, Defendant argues the trial court committed reversible error in admitting portions of evidence during the penalty phase of trial, over defense counsel's objections, pertaining to Defendant's alleged involvement in heroin overdoses which resulted in the death of persons other than Victim. Specifically, Defendant asserts in his first point that the trial court erred in allowing Chris Duren ("Ms. Duren") to testify and make a statement regarding Defendant's alleged involvement in her son Brandon's heroin overdose which resulted in his death. In his second point, Defendant argues the trial court erred in allowing the prosecuting attorney and Victim's sister, Jessica Geiger ("Ms. Geiger"), to have an exchange before the jury regarding Defendant's alleged involvement in heroin overdoses which resulted in the deaths of five persons other than Victim. And in his third point, Defendant contends the trial court erred in allowing Defendant's probation officer, Ms. Kruse, to testify as to what she read in a police report regarding Defendant's alleged involvement in Bill Flannery's heroin overdose which resulted in his death.

#### a. Relevant Law

During the penalty phase of a trial, a wide range of evidence supporting or mitigating punishment is admissible, and the trial court has broad discretion to admit any evidence it believes may be helpful to the jury in assessing punishment. *State v. Bowman*, 337 S.W.3d 679, 691 (Mo. banc 2011); *Mason v. State*, 368 S.W.3d 182, 187 (Mo. App. W.D. 2012); section

19

557.036.3 RSMo Supp. 2004.[11] "Such evidence may include, within the discretion of the court, evidence concerning the impact of the crime upon the victim, the victim's family and others, the nature and circumstances of the offense, and the history and character of the defendant." Section 557.036.3.

"Although evidence pertaining to criminal conduct of the defendant not resulting in conviction is relevant to the defendant's history and character, such evidence is admissible in a penalty phase only if the State proves, by a preponderance of the evidence, that the defendant engaged in the conduct alleged."[12] *State v. Doss*, 394 S.W.3d 486, 496 (Mo. App. W.D. 2013) (citing *State v. Fassero*, 256 S.W.3d 109, 119 (Mo. banc 2008)). Our Court has held that testimony from a victim of a defendant's prior unadjudicated criminal conduct regarding a defendant's actions at the time of the alleged offense satisfies the preponderance of the evidence standard and is admissible as "history and character" evidence pursuant to section 557.036.3. *State v. McArthur*, 343 S.W.3d 726, 727-28 (Mo. App. E.D. 2011). In other words, a victim's testimony regarding his or her firsthand knowledge of a defendant's prior unadjudicated criminal conduct at the time of the alleged offense satisfies the preponderance of the evidence standard and is admissible under section 557.036.3. *See id*. Our Court has also held a defendant's admission that he committed prior unadjudicated criminal conduct satisfies the preponderance of the evidence standard and is admissible as "history and character" evidence pursuant to section 557.036.3. *State v. Hadley*, 357 S.W.3d 267, 273 (Mo. App. E.D. 2012).

However, the penalty-phase evidence at issue in this case does not involve firsthand testimony from a victim or other person regarding his or her knowledge of Defendant's prior

---

[11] All further references to section 557.036 are to RSMo Supp. 2004, which incorporates legislative amendments through 2003.

[12] For purposes of this opinion, we will sometimes refer to evidence pertaining to criminal conduct of the defendant not resulting in conviction as evidence of "prior unadjudicated criminal conduct," which is a term used by the Missouri Supreme Court in *State v. Clark*, 197 S.W.3d 598, 600 (Mo. banc 2006).

20

unadjudicated criminal conduct.  In other words, while the witnesses may have been seriously affected because of the previous heroin overdoses and resulting deaths, none were physically present and the witnesses lacked firsthand knowledge of the facts of those incidents.  Moreover, some of the penalty-phase evidence in this case involves hearsay testimony, while other portions of the evidence include admissions made by Defendant.  Accordingly, it is necessary for us to examine what Missouri cases have held regarding the admissibility of hearsay testimony and a defendant's admissions during the penalty phase.

A witness's testimony constitutes hearsay when it relates to an out-of-court statement and is offered for the truth of the matter asserted.  *State v. Stamps*, 865 S.W.2d 393, 398 (Mo. App. E.D. 1993).  "[I]n a jury trial, whether involving a determination of guilt or a sentencing proceeding under section 557.036, hearsay that does not qualify under an exception to the rule should be excluded, as it would be in any other jury proceeding."  *State v. Berry*, 168 S.W.3d 527, 540 (Mo. App. W.D. 2005).  Accordingly, hearsay testimony during the penalty phase is inadmissible unless it falls within a recognized hearsay exception.  *Id.*; *see also State v. McFadden*, 369 S.W.3d 727, 752-53, 753 (Mo. banc 2012) (finding "[a] hearsay statement is inadmissible unless it is a recognized hearsay exception" in the context of discussing whether evidence was admissible during the penalty phase).

Nevertheless, the admission of a criminal defendant is not considered to be hearsay.  *Id.*; *State v. Brown*, 833 S.W.2d 436, 438-39 (Mo. App. W.D. 1992); *see Hadley*, 357 S.W.3d at 271-73 (rejecting defendant's hearsay argument when there were admissions by the defendant).  And as previously stated, our Court has held a defendant's admission that he committed unadjudicated criminal conduct satisfies the preponderance of the evidence standard and is admissible as "history and character" evidence pursuant to section 557.036.3.  *Hadley*, 357

21

S.W.3d at 273. To determine whether a defendant's statement constitutes an admission, the statement must be viewed in light of the surrounding circumstances. *State v. Brummall*, 51 S.W.3d 113, 119 (Mo. App. W.D. 2001).

An admission is admissible if it "tends to incriminate the defendant, to connect the defendant to a crime, or to manifest the defendant's consciousness of guilt." *McFadden*, 369 S.W.3d at 753; *State v. Simmons*, 233 S.W.3d 235, 237, 237-38 (Mo. App. E.D. 2007) (quotations omitted). The defendant need not expressly acknowledge his guilt for a statement to qualify as an admission, and statements by an accused from which an inference of guilt may be drawn are admissible. *State v. Francis*, 455 S.W.3d 56, 68 (Mo. App. E.D. 2014); *Brummall*, 51 S.W.3d at 119. Statements of third parties which give context to a defendant's admission are commonly referred to as adoptive or tacit admissions. *Francis*, 455 S.W.3d at 69. "Under the adoptive admission rule, a statement of another person is admissible as evidence against a criminal defendant when the defendant assents to or adopts the statement made by the other person through the defendant's words or conduct." *Id*.

### b. Admissibility of Ms. Duren's Testimony and Statement

In Defendant's first point on appeal, he asserts the trial court erred in allowing Ms. Duren's testimony regarding her son Brandon's overdose and death, because her testimony constituted inadmissible hearsay of another offense that was offered for the truth of the matter asserted and was not proven by a preponderance of the evidence. Defendant further asserts the trial court erred in allowing Ms. Duren to read a statement because she was not a victim of the offense at issue in this case and her statement was inadmissible under section 557.041.2 RSMo

22

2000.[13] Because we find these claims of error are properly preserved,[14] we review the trial court's rulings regarding the admission of Ms. Duren's testimony and statement for an abuse of discretion. *See Thurman*, 272 S.W.3d at 496-98.

### i.     Ms. Duren's Testimony

The issue in this part of Defendant's first point on appeal is whether Ms. Duren's testimony pertaining to Defendant's alleged involvement in her son Brandon's heroin overdose which resulted in his death was admissible as "history and character evidence" under section 557.036.3. In other words, the issue is whether the State proved, by a preponderance of the evidence, that Defendant engaged in the conduct alleged.

In this case, Ms. Duren testified her son Brandon died from a heroin overdose at a hotel about one month before the Victim. Ms. Duren testified that after Brandon's death she talked to four persons who were at the hotel on the day her son died: Defendant, a man, a maintenance person, and a medical examiner.

---

[13] All further references to section 557.041 are to RSMo 2000.

[14] The State argues that a portion of Defendant's claims are not preserved for appeal because Defendant did not object to Ms. Duren's testimony about the circumstances of her son's death on the particular basis that such evidence must be proved by a preponderance of the evidence to be admissible as "history and character" evidence under section 557.036.3. "To preserve a claim of error, counsel must object with sufficient specificity to apprise the trial court of the grounds for the objection." *State v. Amick*, 462 S.W.3d 413, 415 (Mo. banc 2015) (quotations omitted). However, it is not necessary for counsel to cite to a specific statute in his objection or motion for new trial, and an objection is sufficiently specific to preserve an issue for appeal where it plainly and unequivocally informs the court of the allegedly erroneous nature of the issue before the court. *Id.* Under the circumstances of this case, we find Defendant's objection to Ms. Duren's testimony on the grounds it constituted hearsay was sufficiently specific to apprise the trial court of the allegedly erroneous nature of Ms. Duren's testimony, including the allegation that Ms. Duren's testimony was inadmissible because she had no firsthand knowledge of the circumstances of her son's death and the related issue of whether her testimony satisfied the preponderance of the evidence standard. *See Doss*, 394 S.W.3d at 491-92, 495-97 (reviewing defendant's argument that evidence did not satisfy the preponderance of the evidence standard for abuse of discretion and thereby implicitly finding the argument was preserved by appeal when defendant objected to the evidence on the basis that it was prejudicial and inflammatory); *McArthur*, 343 S.W.3d at 727-28 (indicating that a victim's firsthand knowledge of a defendant's prior unadjudicated criminal conduct at the time of the alleged offense satisfies the preponderance of the evidence standard and is admissible under section 557.036.3); *Stamps*, 865 S.W.2d at 396, 398-99 (indicating that the question of whether a witness's testimony is inadmissible hearsay relates to the issue of whether the witness testified from his or her firsthand knowledge). Therefore, Defendant's objection was sufficient to preserve his claims for appeal.

Ms. Duren's testimony regarding statements Defendant made to her during their conversation constitutes admissions by Defendant, is not hearsay, and is admissible. *McFadden*, 369 S.W.3d at 752-53; *Brown*, 833 S.W.2d at 438-39; *see Hadley*, 357 S.W.3d at 271-73. Defendant admitted to Ms. Duren he had used her son Brandon's cell phone sixteen times to try to call a man three doors down to help Brandon but the man never answered because he was sleeping. Defendant also told Ms. Duren he did not leave Brandon at the hotel, and Defendant admitted he knew Brandon "was gone for three hours prior to a phone call even being made." Defendant's admissions tended to connect Defendant to Brandon's heroin overdose which resulted in his death, and therefore, were admissible. *McFadden*, 369 S.W.3d at 753; *Simmons*, 233 S.W.3d at 237-38. Moreover, we find Defendant's admissions establish by a preponderance of the evidence that Defendant was involved in Brandon's heroin overdose which resulted in his death, and therefore, were admissible as "history and character" evidence under section 557.036.3. *Hadley*, 357 S.W.3d at 273.

The State concedes some of Ms. Duren's other penalty-phase testimony is hearsay, and we agree. Ms. Duren's testimony included references to out-of-court statements related by the above-mentioned sources. According to Ms. Duren, (1) the man saw Defendant "*dragging [Brandon's] lifeless body down three flights of stairs*"; (2) the man called 911 after Brandon overdosed; (3) the man told Defendant to return Brandon's phone and backpack to Brandon's mother; (4) the maintenance person stated Brandon arrived at the hotel at 7:30 a.m. and "they" all left the hotel at around 10:00 a.m. without Brandon; and (5) the medical examiner indicated medical personnel arrived at the hotel at about 1:52 p.m. and they believed Brandon died at about 10:52 a.m. The preceding statements were offered for the truth of the matter asserted – suggesting Defendant was involved in Brandon's heroin overdose and death.

24

Hearsay testimony during the penalty phase is inadmissible unless it falls within a recognized hearsay exception. *Berry*, 168 S.W.3d at 540; *see McFadden*, 369 S.W.3d at 752-53. The State does not argue a recognized hearsay exception applies here to Ms. Duren's testimony pertaining to out-of-court statements, and this Court can find no exception which applies. Accordingly, Ms. Duren's hearsay testimony was inadmissible. Furthermore, we find Ms. Duren's hearsay testimony did not establish by a preponderance of the evidence that Defendant was involved in Brandon's heroin overdose and death, and therefore, her hearsay testimony was not admissible as "history and character" evidence under section 557.036.3. *See Fassero*, 256 S.W.3d at 119; *Doss*, 394 S.W.3d at 496. Accordingly, the trial court abused its discretion and erred in admitting Ms. Duren's hearsay testimony.

Ms. Duren's additional testimony challenged in this point further implicates Defendant in her son's overdose and death. Ms. Duren testified, (1) "*[Defendant] Jason Voss was the last face [Brandon] saw*"; (2) Defendant failed to call 911 when her son overdosed; (3) Defendant left Brandon to die; and (4) Defendant continued to use Brandon's cell phone after Brandon died. We find Ms. Duren's testimony does not establish by a preponderance of the evidence that Defendant engaged in this specific conduct related to her son's overdose and death, because there was no evidence presented indicating Ms. Duren was personally present at the time of the alleged incident or that she otherwise had any firsthand knowledge of Defendant's conduct at the time of the alleged incident. *See McArthur*, 343 S.W.3d at 727-28. Accordingly, the evidence of Defendant's conduct discussed in this paragraph was inadmissible as "history and character" evidence under section 557.036.3, and the trial court abused its discretion and erred in admitting it. *See Fassero*, 256 S.W.3d at 119; *Doss*, 394 S.W.3d at 496.

25

### ii. Ms. Duren's Statement

After Ms. Duren's testimony and as she was beginning to be released, Ms. Duren asked the court, "is it all right [sic] if I read something?" Defense counsel objected on the grounds Ms. Duren had already testified and was not a "victim" in this case. The prosecutor responded by telling the court "this is the sentencing phase" and she had already told Ms. Duren she would be allowed to read a statement. The trial court overruled defense counsel's objection and allowed Ms. Duren to read her statement to the jury,[15] which provided in relevant part:

> [Brandon's] fate was decided up to Mr. Voss. He robbed me of my son's future and I will never – I will miss Brandon until the day I die. I wish he would have never crossed paths with him that day and I just want my baby back . . ..
> Jason, you will never realize what you have taken away from us . . ..
> I've played over and over in my head what I would have wanted to do with you. You are so lucky to be here and so lucky that we're not living back in the day when people took justice into their own hands because, believe me, you would not be sitting there right now.
> So much has been lost and so many families have been torn due to the selfish acts of what this man has done. If it were in my power, you would be sitting in prison for the rest of your life.
> I've been watching you throughout the trial. You show no remorse. I've watched you snicker and smile and I want to know how you cannot feel anything for what you have done . . ..
> I would like for you to consider what I've said in rendering your sentence. What would you want to give somebody who had took [sic] your child's dead, lifeless body down three flights of stairs?

Defendant asserts the trial court abused its discretion in allowing Ms. Duren to read her statement because she was not a victim of the offense in the instant case involving Defendant and Victim and her statement did not concern the facts of this case. For the reasons discussed below, we agree.

---

[15] The trial court did not explicitly state on the record the reason why it allowed Ms. Duren to read her statement to the jury. If the trial court allowed Ms. Duren to read her statement merely because the prosecutor had already told Ms. Duren she would be allowed to read such a statement, the trial court's decision was an abuse of discretion. A prosecutor's assurances to a State witness, no matter how sympathetic that witness may be, should never be a benchmark for admissibility.

Victim impact statements are one method of showing the jury the harm that is caused by a defendant's offense. *Gill v. State*, 300 S.W.3d 225, 232 (Mo. banc 2009). Such evidence is admissible to the extent it concerns the impact of the crime on the family of the victim and others or illustrates that the victim's death represented a unique loss to his or her family. *Id*.; *State v. Williams*, 97 S.W.3d 462, 470 (Mo. banc 2003).

Section 557.041.2 provides:

> At the time of sentencing of any person who has pled guilty or been found guilty of a felony offense, the victim of such offense may appear before the court personally or by counsel for the purpose of making a statement or may submit a written statement. The statement shall relate solely to the facts of the case and any personal injuries or financial loss incurred by the victim. A member of the immediate family of the victim may appear personally or by counsel to make a statement if the victim has died or is otherwise unable to appear as a result of the offense committed by the defendant.

Although section 557.041 does not define the term "victim," section 595.200(6) RSMo 2000 provides that one definition of the term "victim" is:

> a natural person who suffers direct or threatened physical, emotional or financial harm as the result of the commission or attempted commission of a crime. The term 'victim' also includes the family members of a minor, incompetent or a homicide victim.

Accordingly, we find a "victim" under section 557.041.2 may include a direct victim of a crime and the family members of a direct victim. However, section 557.041.2 does not broadly provide that any victim of any offense may make any statement during sentencing. Instead, section 557.041.2 states, "*the victim of such offense may appear before the court . . . for the purpose of making a statement or may submit a written statement. The statement shall relate solely to the facts of the case and any personal injuries or financial loss incurred by the victim.*" (emphasis added). We find the preceding language indicates section 557.041.2 only authorizes a victim of the offense at issue in the instant case to make a statement, and the statement "shall

27

relate solely to the facts of the case and any personal injuries or financial loss incurred by the victim."

Here, Ms. Duren was not a victim of the offenses of which Defendant was found guilty in the instant case (first-degree involuntary manslaughter relating to the death of Victim Douglas Geiger and distribution of heroin to Victim Douglas Geiger), and her statement did not relate solely to the facts of the instant case. Instead, Ms. Duren's statement related to the emotional injury and loss she suffered because of Defendant's alleged involvement in her son Brandon's heroin overdose and death. While Ms. Duren's emotional injury and loss are understandable and justified, we find her statement relating to Defendant's alleged involvement in her son's overdose and death was not authorized under section 557.041.2. Moreover, we cannot find any legal authority indicating Ms. Duren's statement was admissible on some other basis. Accordingly, we find the trial court abused its discretion and erred in admitting Ms. Duren's statement.

### c.    Admissibility of Victim's Sister's Challenged Testimony

Defendant's second point on appeal relates to an exchange between the prosecuting attorney and Victim's sister, Ms. Geiger, during the penalty phase, where she testified as to Defendant's alleged involvement in heroin overdoses which resulted in the deaths of five persons other than Victim.[16] Defendant concedes this claim is not preserved for review because he failed to raise it in his motion for new trial, and therefore, his claim can only be reviewed for plain error. *See State v. Winfield*, 5 S.W.3d 505, 511 (Mo. banc 1999); Rule 29.11(d).

In this case, Ms. Geiger testified that following her brother's death, she joined and became active in anti-heroin groups because the drug was killing so many people and she wanted

---

[16] Portions of Ms. Geiger's testimony which are not challenged on appeal are discussed below in Section II.B.3.b.ii.

to help educate others about it.  The following exchange took place on the record and before the jury:

| | |
|---|---|
| Ms. Geiger: | . . . I wanted people to be just aware of the devastation that my family has suffered and to prevent it in the future. |
| Prosecutor: | And in going through these anti-heroin rallies and in group meetings, you've come in contact with other people that have lost lives; is that right? |
| Ms. Geiger: | Yes. |
| Prosecutor: | Or families that have lost loved ones, I should say? |
| Ms. Geiger: | Yes. |
| Prosecutor: | And it became apparent that many of them had a connecting factor with the [D]efendant; is that right? |
| Ms. Geiger: | Yes. |
| Prosecutor: | In that the [D]efendant was the last one to see them alive; is that right? |
| Ms. Geiger: | Yes. |
| Defense Counsel: | Objection.  Calls for hearsay. |
| Trial Court: | Overruled. |
| Prosecutor: | One of those people that passed away was Brandon Duren; is that right? |
| Ms. Geiger: | Yes.  Five months before my brother. |
| Prosecutor: | There are representatives in the courtroom from Brandon's family – |
| Defense counsel: | Objection – (People in the audience speaking simultaneously). |
| Prosecutor: | Whatever.  I'm getting so used to the objections that I forget what I said.  Jessica, are there people in this courtroom that aren't Doug's family members? |

29

| | |
|---|---|
| Ms. Geiger: | Absolutely. |
| Prosecutor: | Are they here to represent lives that they lost, their families have lost – |
| Ms. Geiger: | Yes. |
| Prosecutor: | – at the hands of Jason Voss? |
| Ms. Geiger: | Yes. |
| Prosecutor: | Who are they? |
| Ms. Geiger: | Brandon Duren, Bill –. |
| Prosecutor: | If you could just stand, so the jury knows who is represented here. |
| Ms. Geiger: | Brandon Duren's family, Bill Flannery's family, Charles Brown, Tim Tanner, Greg Glasock. |
| Prosecutor: | And these people have been with you all week? |
| Ms. Geiger: | Yes. |
| Prosecutor: | Because they want justice for their family members, too? |
| Ms. Geiger: | Yes. |

With respect to the above testimony, Defendant argues the trial court plainly erred in overruling Defendant's hearsay objection and allowing the prosecuting attorney and Ms. Geiger to have an exchange before the jury which, (1) allowed testimony that Defendant was the last person to see multiple people who died of a heroin overdose; (2) identified people who were standing in the courtroom who were not family members of the Victim; (3) allowed testimony that people in the courtroom were there "to represent lives that . . . their families have lost" "*at the hands of [Defendant] Jason Voss*"; and (4) identified the heroin overdose victims. The State concedes Ms. Geiger's testimony, which connects Defendant to the heroin overdoses and resulting deaths of persons other than Victim, appears to be hearsay, and we agree. There is no

30

evidence to suggest Ms. Geiger had any firsthand knowledge of the facts, circumstances, or context of the overdoses and tragic deaths of others. Furthermore, her testimony stems from the conversations she had with the family members of those who died, and it is not clear those family members had firsthand knowledge either. It is without question that Ms. Geiger's testimony was offered for the truth of the matter asserted – to demonstrate Defendant was involved in heroin overdoses which resulted in the death of persons other than Victim.

We note Ms. Geiger meets the definition of a "victim" under section 557.041.2, because she is a family member of a direct victim of a crime. Accordingly, Ms. Geiger was authorized by law to testify and give a statement relating to the impact of the crime in the instant case on her and others and any personal injuries or financial loss she incurred based on the facts of this case.[17] *Gill*, 300 S.W.3d at 232; *Williams*, 97 S.W.3d at 470; section 557.041.2.

However, the testimony challenged in this point did not relate to the impact of the crime in the instant case or the facts of this case; instead, it related to Defendant's alleged prior unadjudicated criminal conduct. As previously stated, evidence of Defendant's prior unadjudicated criminal conduct is only admissible as "history and character" evidence under section 557.036.3 if it is proven by a preponderance of the evidence that Defendant engaged in the conduct alleged. *Fassero*, 256 S.W.3d at 119; *Doss*, 394 S.W.3d at 496. Here, Ms. Geiger's testimony does not establish by a preponderance of the evidence that Defendant was involved in heroin overdoses and resulting deaths of the five named individuals, because there was no evidence presented that, (1) she was personally present at the time of the alleged offenses; (2) she otherwise had any firsthand knowledge of Defendant's conduct at the time of the alleged incidents; or (3) Defendant made any admissions to her about his conduct. *See Hadley*, 357

---

[17] In fact, Ms. Geiger gave such admissible testimony during the penalty phase, relevant portions of which are discussed in Section II.B.3.b.ii.

S.W.3d at 273; *McArthur*, 343 S.W.3d at 727-28. The passages of Ms. Geiger's testimony identified at the beginning of this subsection were inadmissible as "history and character" evidence under section 557.036.3, and the trial court erred in admitting this portion of the evidence during the penalty phase.[18] *See Fassero*, 256 S.W.3d at 119; *Doss*, 394 S.W.3d at 496.

### d. Admissibility of Defendant's Probation Officer's Challenged Testimony

In Defendant's third and final point on appeal for purposes of our discussion, he asserts the trial court erred in allowing his probation officer, Ms. Kruse, to testify during the penalty phase as to what she read in a police report regarding Defendant's alleged involvement in Bill Flannery's heroin overdose which resulted in his death.[19] Defendant concedes this claim is not preserved for review because he failed to raise it in his motion for new trial, and therefore, his claim can only be reviewed for plain error. *See Winfield*, 5 S.W.3d at 511; Rule 29.11(d).

Ms. Kruse testified she was Defendant's probation officer as a result of Defendant's conviction for misdemeanor endangering the welfare of a child. Defendant asserts the trial court plainly erred in overruling his hearsay objection and allowing Ms. Kruse to testify as follows:

| Ms. Kruse: | According to the [p]olice [r]eports obtained, [Defendant] was in a home with, at the time I believe it was his ex-wife, their small child and two other adults. |
|---|---|
| | In the home there was Heroin and Xan[a]x being used. The two people that own the home went into distress. His wife had also used and so he had told his wife to take their son out of the house so that he could call 9-1-1. |

---

[18] We need not determine whether the erroneous admission of Ms. Geiger's testimony rose to the level of "plain error," because, as discussed below in Section II.B.3., we find no outcome-determinative prejudice occurred as a result of the trial court's error.

[19] Only Ms. Kruse's testimony based upon what she read in a police report is challenged on appeal. As explained below in Section II.B.3.b.i., other portions of Ms. Kruse's testimony, including testimony relating to Defendant's alleged involvement in Bill Flannery's heroin overdose which resulted in his death, was not objected to at trial, is not challenged on appeal, and was admissible.

> From what I understand, the gentleman that was, that owned the house died that day. The other, the female did survive the overdose.
>
> However, his wife, when she took the son out of the home, passed out on a busy side street and the two-year-old was found walking in a busy intersection.

Prosecutor: And they had all been using in the home with the two-year-old, correct?

Ms. Kruse: That's what the [p]olice [r]eport says, yes.

Defendant claims the preceding testimony was inadmissible hearsay evidence because it was based upon what Ms. Kruse read in a police report prepared by another person. We agree.

Where, as in this case, the evidence establishes that a witness is not the person who prepared the police report, the witness's testimony as to the contents of the report is "clearly hearsay as to the person who prepared the report." *State v. Williams*, 473 S.W.2d 388, 390 (Mo. 1971). Hearsay testimony during the penalty phase is inadmissible unless it falls within a recognized hearsay exception. *Berry*, 168 S.W.3d at 540; *see McFadden*, 369 S.W.3d at 752-53. The State does not argue a recognized hearsay exception applies to Ms. Kruse's testimony pertaining to what she read in the police report, and this Court can find no exception which applies to the circumstances of this case.

In addition, Ms. Kruse's testimony as to what she read in the report does not establish by a preponderance of the evidence that Defendant was involved in Bill Flannery's heroin overdose which resulted in his death, because there was no evidence presented that Ms. Kruse was personally present at the time of the alleged incident or that she otherwise had any firsthand knowledge of the alleged incident. *See McArthur*, 343 S.W.3d at 727-28. Accordingly, Ms. Kruse's testimony as to what she read in the police report was inadmissible as "history and

character" evidence under section 557.036.3, and the trial court erred in admitting that portion of her testimony.[20] *See Fassero*, 256 S.W.3d at 119; *Doss*, 394 S.W.3d at 496.

### e. The Trial Court's Errors

As reflected in our discussion above, the trial court erred in, (1) admitting Ms. Duren's hearsay and non-hearsay testimony in the penalty phase which contained supposed details of Defendant's involvement in her son Brandon's heroin overdose and death; (2) allowing Ms. Duren to make a statement during the penalty phase which related to Defendant's alleged direct involvement in her son's heroin overdose and death; (3) allowing the prosecuting attorney and Victim's sister, Ms. Geiger, to have an exchange during the penalty phase which directly implicated Defendant in the heroin overdoses and deaths of five persons other than Victim; and (4) allowing Defendant's probation officer, Ms. Kruse, to testify during the penalty phase as to what she read in a police report regarding Defendant's alleged involvement in Bill Flannery's heroin overdose and death.

### 3. Whether the Erroneous Admission of Evidence was Prejudicial

Regardless of whether the standard of review is abuse of discretion, as it is with respect to point one in this case, or plain error, as it is with respect to points two and three, we will not reverse Defendant's sentence unless the erroneously-admitted evidence was prejudicial, i.e., outcome determinative. *Fassero*, 256 S.W.3d at 119; *Baxter*, 204 S.W.3d at 652; *Thurman*, 272 S.W.3d at 496-98. Erroneously-admitted evidence in the sentencing phase is outcome determinative if "there is a reasonable probability that the jury would have imposed a lesser sentence but for the erroneously admitted [evidence]." *Fassero*, 256 S.W.3d at 119.

---

[20] In this case, we need not determine whether the erroneous admission of Ms. Kruse's testimony rose to the level of "plain error," because, as discussed below in Section II.B.3., we find no outcome-determinative prejudice occurred as a result of the trial court's error.

In order to ascertain whether the preceding standard has been met here, we must review the record as a whole and consider factors including, (1) the severity of the sentence imposed, i.e., whether the jury recommended the maximum of authorized punishment; (2) whether the erroneously-admitted evidence was inflammatory and/or similar in nature to the crime with which defendant was convicted; (3) whether the erroneously-admitted evidence contained details similar to any of the conduct at issue in the instant case; (4) the evidence presented at the guilt phase, including the nature of the crimes with which defendant was convicted; and (5) other properly-admitted evidence at the sentencing phase, including whether defendant expressed pride in his alleged previous criminal activities. *See id.* (severity of the sentence imposed and whether improper evidence was inflammatory and similar in nature); *Martin v. State*, 291 S.W.3d 846, 851-52 (Mo. App. W.D. 2009) (nature of the crimes); *Thurman*, 272 S.W.3d at 498 (detailed nature of improper evidence, other properly-admitted evidence); *State v. Wayman*, 926 S.W.2d 900, 904 (Mo. App. W.D. 1996) (evidence defendant expressed pride in his alleged previous criminal activities); MAI CR-3d 305.03 (effective June 27, 2003) (indicating the jury may consider evidence presented during the guilt phase in assessing and declaring the defendant's punishment).[21] "Generally, prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes essentially the same facts." *State v. Kelly*, 367 S.W.3d 629, 630 (Mo. App. E.D. 2012) (quotations omitted).

---

[21] All further references to MAI CR-3d 305.03 are to the version effective June 27, 2003. MAI CR-3d 305.03 provides, in relevant part, "[i]n assessing and declaring the defendant's punishment . . . [the jury] may consider the evidence presented in either stage of the trial." The preceding language was included in the instructions submitted to the jury during the penalty phase in this case.

35

### a. Factors Supporting a Finding of Prejudice

In this case, the jury recommended the maximum of authorized punishment for both of Defendant's convictions. In addition, the erroneously-admitted evidence was inflammatory, and some of Defendant's alleged conduct was set forth in a detailed manner and similar to his conduct relating to conviction for involuntary manslaughter involving the death of the Victim in this case, Douglas Geiger. Particularly inflammatory were portions of Ms. Duren's and Ms. Geiger's improperly-admitted testimony, which indicated Defendant was seen "dragging [Brandon Duren's] lifeless body down three flights of stairs," Defendant was the last person to see Brandon and four other named heroin overdose victims, and multiple lives were lost "at the hands of [Defendant] Jason Voss." Although the jury's severe sentence and the inflammatory and detailed nature of the improperly-admitted evidence arguably supports a finding of prejudice, *see Fassero*, 256 S.W.3d at 119 and *Thurman*, 272 S.W.3d at 498, we conclude other factors are dispositive in our determination as to whether there is a reasonable probability that the jury would have imposed a lesser sentence on Defendant but for the erroneously-admitted evidence.

### b. Factors Supporting a Finding of No Prejudice

#### i. Defendant's Admissions

First, there was evidence presented in the penalty phase that Defendant admitted he was involved in two specific persons' heroin overdoses and resulting deaths – Brandon Duren's and Bill Flannery's. As we have already discussed, Defendant made admissions to Ms. Duren that he was involved in Brandon's heroin overdose which resulted in his death, and those admissions were properly admitted into evidence. Defendant also admitted to Ms. Kruse that he was involved in Bill Flannery's heroin overdose and resulting death; specifically, Defendant admitted

36

to Ms. Kruse, (1) he administered aid to Bill Flannery's wife who overdosed and she survived; and (2) Bill Flannery was "too far" gone to help, so Defendant called 911. Like Defendant's admissions to Ms. Duren, Defendant's admissions to Ms. Kruse regarding his involvement in Bill Flannery's heroin overdose and resulting death satisfy the preponderance of the evidence standard and were admissible as "history and character" evidence pursuant to section 557.036.3. *Hadley*, 357 S.W.3d at 273.

In addition, Ms. Kruse testified Defendant admitted to her that he was involved in multiple overdoses in the past, and "[Defendant] appeared proud that he had been witness to numerous overdoses and that he was able to bring them back to life." *See Wayman*, 926 S.W.2d at 904 (evidence indicating a defendant expressed pride in his alleged previous criminal activities supports a finding that defendant was not prejudiced by erroneously-admitted evidence in sentencing). Ms. Kruse also testified, "I asked [Defendant] if he thought [of] himself as the grim reaper since he had been around so many [drug overdoses], and he lifted his shirt and showed me his tattoo of the grim reaper." We find Defendant's conduct in showing his grim reaper tattoo in response to Ms. Kruse's question constituted adoptive admissions that Defendant thought of himself as a grim reaper and that Defendant was involved in multiple instances where persons died of drug overdoses. *See Francis*, 455 S.W.3d at 69 (indicating a defendant makes an adoptive admission when he assents to or adopts the statement of another person by either words or conduct). Out of all of the evidence presented during the penalty phase, Defendant's admission that he characterized himself as a grim reaper was perhaps the most damaging to Defendant, was highly inflammatory, and most importantly, was admissible. *See id.*; *Hadley*, 357 S.W.3d at 273.

In sum, Defendant's properly-admitted admissions to Ms. Duren and Ms. Kruse support a finding Defendant was not prejudiced by the erroneously-admitted evidence in this case. *See Thurman*, 272 S.W.3d at 498.

### ii.  The Nature of Defendant's Crimes in This Case and Victim Impact Evidence

The nature of the crimes Defendant was found guilty of in this case, which relates to the evidence presented at the guilt phase, also supports a finding that Defendant was not prejudiced by the erroneously-admitted evidence. *See Martin*, 291 S.W.3d at 851-52; MAI CR-3d 305.03. Defendant was found guilty of distributing heroin to Victim and recklessly causing his death, and there was evidence Defendant took multiple steps to actively assist Victim in ingesting the heroin which caused Victim's death, including providing advice and technical support in the drug's preparation, helping manufacture the necessary paraphernalia for preparing the drug, and providing the expertise to load the drug-delivery device. There was also evidence Defendant did not go back to check on Victim or seek medical help after Victim exhibited signs of an overdose in Defendant's presence, and Defendant was not completely honest with the police about his involvement in the crimes and instead changed his story throughout the course of his interrogation with Detective O'Heron.

In addition, victim impact evidence from Victim's mother and sister was presented to the jury during the penalty phase. Victim impact evidence, which includes victim impact statements, is admissible to the extent it concerns the impact of the crime on the family of the victim and others or illustrates that the victim's death represented a unique loss to his or her family. *Gill*, 300 S.W.3d at 232; *Williams*, 97 S.W.3d at 470.

Victim's mother read a victim impact statement to the jury, which was unobjected to for purposes of our discussion here,[22] and the admissibility of which is not challenged on appeal. Victim's mother's statement told the jury, *inter alia*, (1) "I hope and pray that this is the last life that [Defendant] take[s] because you know there are others"; (2) she saw Defendant laughing during the trial and believed Defendant lacked remorse; (3) she did not understand why Defendant did not go back and check on her son even though he had thought about it three times; (4) the importance of her son's life to her and how her son's death has affected her; (5) "[t]he actions concerning the death of my son and so many others show without a doubt that you're not interested in changing your ways"; and (6) ". . . I think you call yourself the grim reaper. So I'd like to ask the jury to consider your lack of remorse, your past involvement in so many deaths, to give [Defendant] the maximum sentence and to please stop any other mother from having to endure this."[23]

The jury also was presented with portions of victim impact testimony from Victim's sister, Ms. Geiger, which was not objected to and the admissibility of which is not challenged on appeal. Specifically, Ms. Geiger told the jury, (1) she wants "people to be [ ] aware of the devastation that my family has suffered and to prevent it in the future"; (2) "[Victim's] death has forever changed my life. I am going to law school because I want to keep people like [Defendant] Jason Voss far away from anyone that they can hurt, and my brother did not deserve

---

[22] There was only one objection to Victim's mother victim impact statement; when Victim's mother first started to make her statement, defense counsel objected on the grounds that Victim was directing her comments to Defendant instead of the jury. The trial court overruled the objection, and it is not at issue in this appeal.

[23] To the extent Victim's mother's statement referenced some of Victim's involvement in heroin overdoses which resulted in the death of persons other than Victim, Victim's mother's statement was not objected to on those grounds, and, again, the admissibility of Victim's mother's statement is not challenged on appeal. Moreover, we find the portion of Victim's mother's statement which referenced some of Defendant's involvement in heroin overdoses which resulted in the death of persons other than Victim was merely cumulative to Defendant's admissions to his probation officer discussed in the previous subsection which sufficiently established essentially the same facts. "Generally, prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes essentially the same facts." *Kelly*, 367 S.W.3d at 630 (quotations omitted).

39

to die from his terrible choice that he made"; and (3) "I beg that you impose the maximum sentence allowable by law. There are so many people that Jason Voss has hurt."

### c.    Conclusion as to Prejudice

In sum, the jury was presented with evidence regarding Defendant's admitted involvement in multiple heroin overdoses which resulted in the death of persons other than Victim, Defendant's admission that he characterized himself as a grim reaper, the nature of Defendant's crimes in this case, and victim impact evidence. The preceding evidence was properly admitted and/or unobjected to, and it is not challenged on appeal. Based on the foregoing, and despite the trial court's errors, we find there was substantial evidence presented to the jury to believe Defendant constituted a genuine threat to others and that a maximum sentence was appropriate, and we cannot conclude there is a reasonable probability that the jury would have imposed a lesser sentence but for the erroneously-admitted evidence.[24] *See Fassero*, 256 S.W.3d at 119 (prejudice in the sentencing phase requires an appellate court to "determine whether there is a reasonable probability that the jury would have imposed a lesser sentence but for the erroneously admitted [evidence]"); *Wayman*, 926 S.W.2d at 902, 904 (finding no prejudice from the introduction of improperly-admitted evidence in conviction involving a minor where "[s]ubstantial evidence was presented for the jury to believe that [defendant] constituted a genuine threat to children and that the maximum sentence was appropriate"). Points one, two, and three are denied.

---

[24] We encourage trial courts to be cautious in admitting inflammatory evidence of a defendant's alleged prior unadjudicated conduct. In this case, if it was not for the off-setting, highly inflammatory, and admissible admissions made by Defendant, and most notably his admission that he characterized himself as the "grim reaper," the trial court's errors would have likely led this Court to reverse the sentencing portion of the trial court's judgment and remand for a new penalty phase and resentencing.

### III. CONCLUSION

The judgment and sentence are affirmed.

_____
ROBERT M. CLAYTON III, Presiding Judge

Lawrence E. Mooney, J., and
James M. Dowd, J., concur.