

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112276 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Rex M. Burlison |
| JEFFREY REUTER, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 1, 2025 |

A jury convicted Jeffrey Reuter of three counts of tampering with a judicial officer for delivering demand letters to the homes of three St. Louis County judges, each of whom had presided over Reuter's dissolution or modification proceedings at some point. Reuter appeals, claiming the trial court erred by (1) admitting evidence of the victims' emotional responses to his conduct, (2) by overruling his objection to a comment made by the prosecutor during the trial and (3) allowing hearsay evidence during the penalty phase of the trial. The judgment is affirmed.

### Factual and Procedural Background

Beginning in 2013, Judge J.B. presided over the dissolution of Reuter's marriage to his ex-wife, which involved a dispute over custody and support relating to their young daughter. Among other rulings, Judge J.B. granted Reuter's ex-wife's request for an order of protection based on allegations of domestic violence (later withdrawn as part of a negotiated settlement) and entered an order of contempt against Reuter for failing to pay child support and maintenance. Reuter was

arrested on the contempt order and released the next day after it was discovered that he had actually submitted the required payment by the order's deadline. The dissolution proceedings concluded in 2014 with a consent judgment that awarded Reuter's ex-wife legal custody of their daughter.

In 2016, Reuter filed a federal lawsuit against Judge J.B. seeking damages as a result of his "unlawful arrest" on the contempt order. In alleging psychological damages, Reuter's complaint asserted that, "[p]rior to the unlawful arrest warrant, [he] was not a gun owner" but he was now the "owner of three." The complaint added that Reuter never traveled in his truck without a gun in his possession and that "judges who can sign arrest warrants indiscriminately" were a threat to him. The federal district court dismissed Reuter's complaint based on judicial immunity, a decision that was affirmed on appeal.

Reuter and his ex-wife later filed cross-motions to modify the dissolution judgment, and Judge M.G. began presiding over the case in 2017. Among other rulings, Judge M.G. (1) denied Reuter's request to dissolve a temporary restraining order issued by another judge (which had initially prohibited contact with his ex-wife and daughter and was later amended to permit supervised visitation with his daughter), (2) granted his ex-wife an order of protection based on allegations that Reuter violated the temporary restraining order and (3) found Reuter in contempt for failing to pay child support. Judge M.G. ultimately granted Reuter's ex-wife's motion to modify after a trial and dismissed Reuter's motion to modify for failing to appear at the trial. Reuter filed a motion for new trial, which Judge M.G. denied.

In early 2019, the case was reassigned for administrative reasons to Judge J.G. Over the following months, Judge J.G. simply issued two payout orders. He never saw Reuter or his attorneys in person.

On Saturday morning, December 7, 2019—while the modification proceedings were still pending before Judge J.G.—Reuter delivered to the personal residences of all three judges an envelope containing numerous documents, including one entitled "Demand Notice." The demand was addressed to Judges J.B., M.G. and J.G. and stated:

> All avenues of civil dispute resolution through government channels have been exhausted. I have compiled a mountain of evidence which shows the indifference of state and federal offices to judicial misconduct. These offices include, but are not limited to, that of the Governor, Attorney General, Chief Disciplinary Counsel, Commission on Judicial Discipline, and U.S. Justice Department.
>
> Demands are being placed upon you to remedy the injuries which resulted from your unlawful conduct. Failure to satisfy these demands will compel me to take pre-emptive, defensive measures against reasonably expected, further unlawful conduct on your part.
>
> Refer to the enclosed copy of a partial court filing in [the modification case] to refresh your memories of your transgressions. You have until midnight December 31, 2019 to comply.
>
> The demands are as follows.
>
>> 1. As compensation for injuries, [Judge J.B.] and/or [Judge M.G.] shall pay $2,000,000 (two million dollars) to Reuter. The liability of each offender is $1,000,000 (one million dollars). How this payment is split between [Judge J.B.] and [Judge M.G.] makes no difference to Reuter.
>>
>> 2. [Judge J.G.] shall vacate all previous judgments/orders of the STL County Circuit Court since 2012 in cases which name Reuter as a party. [Judge J.G.] shall do what is necessary to assure that Reuter's dissolution remains once the dissolution judgment of 2013 is vacated.
>>
>> 3. [Judge J.G.] shall cause a payment to Reuter of $500,000 (five hundred thousand dollars). This amount comprises a refund of the money stolen from Reuter by [Judge M.G.] in [the modification case], accrued interest, and penalties. Who makes this payment makes no difference to Reuter.
>>
>> 4. [Judge J.G.] shall command [Reuter's ex-wife] to relinquish custody of [their daughter], to Reuter every weekend of the year and all holidays. Reuter may make exceptions to this custody arrangement at the request of [his ex-wife]. [Judge J.G.] shall contact [Reuter's ex -wife] to determine locations of exchanges and

3

other relevant details.  Final approval of the details must be given by Reuter via electronic mail communications.

5. [Judge J.B.], [Judge M.G.] and/or [Judge J.G.] shall cause the removal of all case entries in Casenet which are linked to Reuter.

6. [Judge J.B.] and [Judge M.G.] shall compose letters to [Reuter's daughter].  The letters shall offer apologies to [her] for their willful offenses which have separated [her] from her father and defamed her father's character.  The letters shall be sent to Reuter via standard mail.

Full satisfaction of these demands will make us square.  Anything less than a full satisfaction of these demands by the end of year 2019 will result in all three judges named above being deemed non-compliant.  Be advised .. immunity is not available to you this go-around.

Any government communication or action directed toward Reuter, or toward third parties under Reuter's direction, that is not specifically stated in the above demands, will indicate your unwillingness to comply and will signal a forfeiture of the grace period.

Mail payments, letters to [Reuter's daughter], and notices of case entries to:

Jeffrey D. Reuter
[Address, partial phone number and email]

Reuter first went to Judge M.G.'s house.  He parked his truck across the street and sat inside the truck for about five minutes.  He then walked up to the house with his left hand in his pocket and rang the doorbell.  Judge M.G. was upstairs at the time.  When she heard the doorbell, she used her phone to access her doorbell camera and was "stunned" to see Reuter at her door.  Judge M.G. was afraid to go downstairs, so she waited on the second floor.  After Reuter left, she went downstairs and found in her mailbox documents addressed to her and Judges J.B. and J.G.  Judge M.G. testified that she was "shaky," "panicked" and "crying."  She explained that she was scared because she knew Reuter had stated during the family court case "that he always had a gun in his truck" and had threatened those who "have wronged him."  She was also aware that Reuter had to have a security escort with him at all times in the courthouse.  This information led her to believe that Reuter was "a very dangerous individual."  Before reading Reuter's demand, she

4

contacted Judges J.B. and J.G. to warn them that Reuter might be coming to their homes. Judge M.G. testified that she was "fearful" and "terrified" after she read Reuter's demand, which she interpreted as an "overt threat" of violence. Judge M.G. believed that Reuter would kill her if she did not comply with his demand by the stated deadline or if she went to the authorities. She also testified that she was afraid and unable to eat or sleep until Reuter was arrested and was still fearful four years later at the time of trial.

Reuter's next stop that Saturday was at Judge J.B.'s house. Judge J.B. was out of town, but his wife was home with one of their daughters. After parking his truck in front of the residence, Reuter walked up to the front door and rang the doorbell. Judge J.B.'s wife answered the door and asked, "Can I help you?" Without making eye contact, Reuter handed her an envelope and said, "This is for [Judge J.B.]" Judge J.B.'s wife thought it was strange that the envelope had no legal or professional markings on it and she "got a really bad feeling." She also noted that Reuter kept his left hand in his pocket during their interaction. After Reuter left, Judge J.B. contacted his wife, instructing her to not open the door for anyone. She explained her interaction with Reuter, and Judge J.B. told her to open the envelope. Judge J.B.'s wife was "horrified" by the contents of Reuter's demand and found it "terrifying." She testified that she was "panicked," "seriously frighten[ed]" and "very alarm[ed]." Judge J.B. testified that Reuter's demand caused him to "fear" that Reuter was issuing a "clear threat" of harm to him and his family and he was "very concerned." When asked what had contributed to his emotional response, Judge J.B. recalled that Reuter's federal lawsuit indicated that Reuter carried firearms because he thought judges "were out to get him." Judge J.B. believed Reuter will remain a threat to him once he is out of custody.

Reuter's final visit was to Judge J.G.'s residence. After Judge J.G. received the warning from Judge M.G., he called the police and waited with his gun in the front room of his house for

5

Reuter to arrive. His wife and son were also there, but they stayed in a back room where they could easily exit if Reuter got into the house. Judge J.G. testified that he saw a truck pull up and park in his driveway. Keeping one hand in his pocket, Reuter approached the front door, rang the doorbell and knocked for a few minutes. After Reuter left, the police arrived and discovered an envelope underneath the windshield wiper of one of Judge J.G.'s vehicles. Judge J.G. took the contents of Reuter's demand as a threat, believing "there would be retribution" if he did not comply, resulting in death or harm to him or his family. Judge J.G. described himself as "worried" and "anxious."

Law enforcement officers later arrested Reuter at his residence. He initially refused to leave his house, telling the officers that the arrest warrant was from a "crooked" and illegitimate court. Reuter also told the officers that he had "exhausted every avenue to try to resolve his situation through legal matters" and stated that "judges rule and not the law . . . getting away with whatever they want." After his arrest, the police recovered from Reuter's truck two notebooks in which he had written: "get address of all targets prior to onset of operation" and "judges need to fear for their safety."

At trial, the verdict director for each count of tampering with a judicial officer instructed the jury to find Reuter guilty if it believed that, "with the purpose to harass" the respective judge identified in that count, Reuter engaged "in conduct reasonably calculated to harass or alarm" the judge by delivering the demand to his or her home. The jury found Reuter guilty of all three counts.

During the penalty phase, after presenting testimony from Judge M.G., Judge J.G. and one of the arresting officers, the State argued that Reuter was "hellbent on vengeance," lacked remorse and was "still dangerous." The State requested the jury to impose the maximum sentence of seven

6

years in prison on each count, but the jury assessed a sentence of four and one-half years on each. The trial court entered judgment consistent with the jury's verdicts, ordering the sentences to be served consecutively. This appeal follows.

## Standard of Review

All of Reuter's points on appeal relate to the trial court's evidentiary rulings. A trial court is vested with broad discretion regarding the admission and exclusion of evidence. *State v. Emery*, 701 S.W.3d 585, 600 (Mo. banc 2024). A trial court abuses this discretion if its ruling is clearly against the logic of the circumstances before it and is so unreasonable and arbitrary as to shock our sense of justice and indicate a lack of careful and deliberate consideration. *Id*.

## Discussion

### *Points I, II and III—Evidence of Victims' Subjective Reactions to Demand*

In his first three points on appeal, Reuter argues that the trial court erred by allowing the judges and Judge J.B.'s wife to testify about their emotional responses to receiving Reuter's demand. Reuter asserts that the impact his conduct actually had on them is not an element of the offense and, therefore, the testimony was not logically or legally relevant. We disagree.

A person commits the offense of tampering with a judicial officer if, "with the purpose to harass . . . a judicial officer in the performance of such officer's official duties, such person . . . [e]ngages in conduct reasonably calculated to harass or alarm such judicial officer or such judicial officer's family." Section 575.095.1(4).[1]

As Reuter correctly points out, this statute does not prohibit conduct "merely because it happens to alarm the person to whom it is directed." *State v. McGirk*, 999 S.W.2d 298, 302 (Mo. App. W.D. 1999) (citing section 565.084 RSMo (Cum. Supp. 1997)).[2] Rather, the focus is on the

---

[1] All statutory references are to RSMo (2016), unless otherwise indicated.
[2] Effective January 1, 2017, the tampering statute was transferred from section 565.084 to section 575.095.

7

impact the conduct "is intended to have on the person to whom it is directed." *Id*. Therefore, the State is not required to present evidence about the particular judicial officer's actual reaction to the defendant's conduct. *See State v. Wolfe*, 332 S.W.3d 877, 880 (Mo. App. S.D. 2011) (rejecting challenge to sufficiency of the evidence because the judge did not testify that he felt threatened by the defendant's conduct). But whether the judicial officer's reaction is necessary or adequate proof of an element of this crime goes to the *sufficiency* of the evidence, which Reuter does not challenge on appeal. Rather, he disputes only the *admissibility* of the evidence of the emotional responses. "Admissibility and sufficiency are separate and distinct," and the admissibility of evidence does not depend on whether it alone would be sufficient to submit the case. *Look v. French*, 144 S.W.2d 128, 131 (Mo. 1940).

Whether the challenged evidence is admissible depends on its logical and legal relevance. *See Emery*, 701 S.W.3d at 601. "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." *Id.* (internal quotation marks and citation omitted). "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* (internal quotation marks and citation omitted).

As the State maintained at trial, evidence that the judges and Judge J.B.'s wife were all alarmed by Reuter's conduct is circumstantial evidence showing his conduct was "reasonably calculated to harass or alarm" them under section 575.095.1(4). The "reasonably calculated" element is met when an ordinary person in the same circumstances as the judicial officer would feel harassed or alarmed by the defendant's conduct. *State v. Jindra*, 504 S.W.3d 187, 191 (Mo.

8

App. W.D. 2016). The *Jindra* court imposed this objective standard after finding guidance in federal case law regarding the intimidation element of the bank robbery statute. *Id.* That element, according to the federal courts, requires proof that the defendant's conduct was reasonably calculated to produce fear, which must be determined under an ordinary person standard. *See id.* Even though the ultimate standard is an objective one, "how the [bank] teller who encountered the defendant felt at the time is probative of whether a reasonable person would have been afraid under the same circumstances." *United States v. Burnley*, 533 F.3d 901, 903 (7th Cir. 2008) (internal quotation marks and citation omitted). Stated another way, while the victim's fear need not be proven under the bank robbery statute, such evidence is nevertheless "probative of whether [the defendant's] acts were objectively intimidating." *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987). Similarly, while the "reasonably calculated" element in the tampering statute is determined under an objective standard and the victim's fear need not be proven, the subjective experience of the judicial officer who encountered the defendant is nevertheless probative of whether a reasonable person would have felt harassed or alarmed under the same circumstances.

Here, everyone had similar emotional responses to Reuter's conduct, which makes it more likely than not that an ordinary person would have also felt that way. Though they described it in different ways, the three judges and Judge J.B.'s wife were all alarmed by Reuter's actions and what they considered to be threats contained in his demand: Judge J.B. had "fear" and was "very concerned," and his wife was "alarm[ed]," "terrif[ied]," "horrified," "panicked" and "seriously frighten[ed]." Judge M.G. was "terrified," "scared," "fearful," "shaky," "panicked," "worried" and "afraid." Judge J.G. was "worried" and "anxious." The fact that *any* of them felt this way would tend to make it at least somewhat more probable that an ordinary person would be similarly alarmed by Reuter's conduct under the circumstances. Because *all of them* felt alarmed, their

9

testimony is even more probative of what was objectively alarming. Therefore, the testimony was logically relevant to the "reasonably calculated to alarm" element of this offense.

As to legal relevance, Reuter merely argues that because "this evidence held no probative value, its prejudicial effect outweighed its probative value." Reuter's calculation is based on the flawed premise that this evidence had no logical relevance and, thus, its sole purpose was to appeal to the jurors' emotions. Having concluded that the testimony was indeed probative, we find that Reuter has not met his burden of showing that the trial court's weighing of that probative value against any prejudicial effect was a clear abuse of discretion. *See Emery*, 701 S.W.3d at 606 (stating that "weighing the probative value against any unfair prejudice is the day-to-day work of circuit courts" and appellate courts "will not find error in such a calculation absent a clear showing that this discretion was abused"). Points I, II and III are denied.

### *Point IV—Prosecutor's "Unsworn Testimony" Regarding Reuter's Left Hand*

In his fourth point on appeal, Reuter claims that the trial court erred in overruling his objection when the prosecutor stated during trial: "I would . . . note for the record that the defendant is holding a pen in his left hand which will become relevant later." Reuter contends this was unsworn testimony about a fact not otherwise in evidence—that Reuter is left-handed—and the trial court should not have "admitted" it. We disagree.

Reuter relies entirely on *State v. Storey*, 901 S.W.2d 886, 900-01 (Mo. banc 1995), in support of this point. In that case, the Court held that it was improper for the prosecutor to argue that the crime was "the most brutal slaying in the history of this county" because there was no evidence about the brutality of other murders in the county. *Id*. An assertion by the prosecutor of an unproven fact is highly prejudicial, the Court reasoned, because it suggests that he or she has

some personal knowledge about the matter, which is apt to weigh against the defendant in the eyes of the jury since they know the prosecutor has a duty to serve justice. *Id.* at 901.

Here, however, the prosecutor's comment about which hand Reuter was using in the courtroom did not suggest that the prosecutor had personal knowledge of facts outside the record. Rather, it was simply an observation about Reuter that anyone in the courtroom could have made. And that is precisely how the prosecutor referred to it during the State's closing argument: "The defendant is left handed. You know that because *you saw him* holding a pen and writing with his left hand during this trial." (emphasis added). The prosecutor went on to argue that, based on the evidence that Reuter always traveled with a gun and that he had his dominant left hand in his pocket while delivering his demand, the jury could infer he had a gun in that pocket.

It is not improper for a prosecutor to comment on something the jurors observed themselves in open court and then make an argument based on that observation, so long as there is no reference to the defendant's failure to testify. *See State v. Jackson*, 444 S.W.2d 389, 392 (Mo. 1969) ("[T]he safeguard against self-incrimination refers to evidence, testimonial compulsion; it does not mean that the accused may not be subjected to the observation of witnesses and jurors." (internal quotation marks and citation omitted)). For instance, in *Murphy v. State*, 512 S.W.3d 125, 131 (Mo. App. E.D. 2017), the prosecutor commented during closing argument that the jury had "probably noticed that [the defendant] cried" during the evidence. Because the prosecutor's comment was directed at something the jurors observed themselves in open court and invited the jury to consider that it showed consciousness of guilt, this Court found the argument was not improper. *Id.*; *see also State v. Smith*, 588 S.W.2d 27, 32-33 (Mo. App. E.D. 1979) (finding prosecutor's comment during closing argument that the jury "no doubt saw [the defendant] sat there covering his face" during the evidence did not refer to his right to testify and at most

11

suggested consciousness of guilt). Notably, Reuter raises no claim of error regarding the prosecutor's closing argument itself—only to the prosecutor's comment earlier in the case—and Reuter does not contend that anything the prosecutor said at either point violated his right against self-incrimination. Point IV is denied.

### *Point V—Hearsay in Victim Impact Testimony*

In his fifth point on appeal, Reuter asserts that the trial court erred in overruling his hearsay objection to certain parts of Judge M.G.'s testimony during the penalty phase. This argument has no merit because none of the challenged statements constituted hearsay.

A trial court has "broad discretion to admit any evidence it believes may be helpful to the jury in assessing punishment" during the penalty phase of the trial, including testimony about the impact of the crime on the victim. *State v. Voss*, 488 S.W.3d 97, 114 (Mo. App. E.D. 2016). Hearsay, however, is not admissible at any stage of a trial unless it falls within a recognized exception. *Id*. at 115. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *Id*. A statement offered for some other purpose, such as to show the effect the statement had on the listener, does not constitute hearsay. *State v. Matthews*, 793 S.W.2d 481, 485-86 (Mo. App. E.D. 1990); *see also* 2 McCORMICK ON EVID. § 249 (9th ed. 2025) (A statement "is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in [the hearer] such as . . . to show the information which [the hearer] had as bearing . . . on the anxiety produced.").

During the penalty phase, Judge M.G. testified about how the crime impacted her, including the difficulty she had reviewing the transcript and orders from the family court case in preparation for trial because doing so reminded her of "how scary [Reuter] is and how he is a man of his word and he will come for me." Judge M.G. testified to some of the statements that Reuter's

12

ex-wife had made during the modification proceedings: (1) that Reuter came to her house in violation of an order of protection to tell her he believed he had left a gun in their five-year-old daughter's backpack, which scared his ex-wife, (2) that Reuter told her that he would "destroy" her and others who "f-ed" with him and (3) that Reuter talked with their daughter about loading guns, "bad judges" and "shooting the judges." Judge M.G. testified that these statements led her to believe Reuter was "hellbent on vengeance" and caused her concern for Reuter's ex-wife, his daughter and herself.

Contrary to Reuter's claim on appeal, these statements were not offered for the truth of the matters asserted. The State was not attempting to prove that Reuter in fact left a gun in his daughter's backpack, that he would destroy anyone who wronged him or that he taught his daughter to load a gun and talked to her about shooting "bad judges." Nor was the State trying to show that Reuter had actually told his ex-wife any of these things. Rather, the State offered this evidence to show the effect hearing those statements had on Judge M.G. Because the State was eliciting testimony about how Judge M.G. felt when she heard them, the challenged statements were not offered to prove the truth of the matters asserted and were not hearsay. *See Matthews*, 793 S.W.2d at 485-86. Point V is denied.

### Conclusion

For the foregoing reasons, the judgment is affirmed.

_____
MICHAEL E. GARDNER, Judge

Thomas C. Clark, II, C.J., concurs.
R. Craig Carter, Sp.J., concurs.

13